UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| JOSEPH MODESKI, et al., on behalf of ) | |
| themselves and all similarly situated employees, ) | Civil Action No. |
| ) | 18-12383-FDS |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| SUMMIT RETAIL SOLUTIONS, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS
AND PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

SAYLOR, J.

This case concerns claims by "Brand Representatives" against their employer, defendant
Summit Retail Solutions, for violations of the Fair Labor Standards Act ("FLSA") and analogous
laws of Maryland, New York, and Pennsylvania. Section 207 of the FLSA requires employers to
compensate all non-overtime exempt employees at not less than one and one-half times their
regular wage for each hour worked in excess of 40 hours per work-week. Only those who work
in certain capacities, including outside salespersons, are exempt from that requirement. Plaintiffs
contend that Summit improperly classified its Brand Representatives as overtime-exempt and
thus denied them overtime compensation to which they were entitled.

Section 216(b) of the FLSA further permits employees to bring collective actions on
behalf of themselves and others who are similarly situated. Plaintiffs have moved to
conditionally certify a collective action and to authorize that notice of this action be sent to
several hundred other Brand Representatives. Defendant has also moved to dismiss the

complaint.  For the following reasons, the motion to dismiss will be denied, and the motion for

conditional certification will be granted.

I.     **Background**

A.     **Factual Background**

The following facts are set forth as described in the complaint.

Summit Retail Solutions, Inc. is a Delaware corporation with its principal place of

business in Massachusetts.  (Compl. ¶¶ 4-5).  It does business throughout the eastern United

States, including in Massachusetts, New York, Pennsylvania, and Maryland.  (*Id.* ¶ 6).  Summit

provides marketing services to its clients, which include department stores, grocery stores, and

wholesale retailers.  (*Id.* ¶ 7).

The marketing services are performed by Brand Representatives.  (*Id.* ¶ 8).  Brand

Representatives are assigned to work at the location of Summit's clients.  (*Id.* ¶ 32).  Their

primary responsibilities include "making sales pitches, performing product demonstrations[,] and

providing samples to customers."  (*Id.*).  Other responsibilities include gathering products from

inventory warehouses, transporting those products to client stores, and assembling and

dissembling promotional displays.  (*Id.* ¶¶ 35-36).

Brand Representatives are assigned to particular geographic territories, which are called

"pods."  (*Id.* ¶ 33).  Each pod corresponds with "a cluster of retail stores" owned by Summit's

clients.  (*Id.*).  Brand Representatives perform several day-long "shows" within their pods.  (*Id.*).

Between October 2014 and March 2017, lead plaintiff Joseph Modeski was employed as

a Brand Representative and assigned to market products at retailers in Maryland, including BJ's,

Costco, and Sam's Club.  (*Id.* ¶ 9).  Between March and September 2015, co-lead plaintiff

Giovanni Zammito was employed as a Brand Representative and assigned to market products at

retailers in New York, including BJ's.  (*Id.* ¶ 10).  Between January and August 2017, co-lead plaintiff Nathan Damboise was employed as a Brand Representative and assigned to market products at retailers in Pennsylvania and Maryland, including BJ's and Sam's Club.  (*Id.* ¶ 11).

Brand Representatives all worked the same schedule.  (*Id.* ¶ 39).  They were scheduled to work Thursdays through Sundays for 10 hours each day.  (*Id.*).  Specifically, they worked from 9:00 a.m. to 7:00 p.m. on Thursdays and Saturdays; from 10:00 a.m. to 8:00 p.m. on Fridays; and from 8:00 a.m. to 6:00 p.m. on Sundays.  (*Id.*).

Compensation could come in two forms:  a base hourly wage and commissions.  Brand Representatives were paid at a rate of $12 per hour.  (*Id.* ¶ 41).  Senior Brand Representatives were paid at a rate of $15 per hour.  (*Id.* ¶ 42).[1]  Brand Representatives were eligible for commissions if they reached certain sales goals.  (*Id.* ¶ 48).  To be eligible, "Brand Representatives were required to accrue a pre-determined percentage of sales that exceeded the sum of their weekly paychecks.  The dollar volume of this percentage was based on the volume of sales generated from the products they marketed."  (*Id.* ¶ 47).  "Whether or not [Brand Representatives] met their goals was determined on a week to week basis."  (*Id.* ¶ 48).  "When the weekly percentage of sales . . . exceeded the sum of [Brand Representatives'] weekly paychecks, a predetermined amount generated from the sales was added to a ledger.  That amount was categorized as a commission."  (*Id.* ¶ 49).

However, "[i]f the weekly sales percentage generated from the marketed products failed to exceed the sum of the[] weekly paycheck[], the difference was subtracted from [the] Brand Representative's ledger."  (*Id.* ¶ 50).  Brand Representatives were eligible for commissions only

---

[1] The complaint does not make clear whether Senior Brand Representatives had any additional responsibilities.  For simplicity, the Court will also refer to "Senior Brand Representatives" as "Brand Representatives."

if their "ledger was positive at the end of the month."  (*Id.* ¶ 51).  In addition, Brand

Representatives "had to ensure that their ledgers never fell below negative three-hundred dollars.

If their ledgers were under negative three-hundred dollars for too long, they could face

disciplinary action," including being demoted or having their pay cut.  (*Id.* ¶ 52).  Moreover, if

Brand Representatives "maintained a negative balance for three months in a row," they "could be

terminated."  (*Id.*).

      The complaint alleges that Summit made it extremely difficult for Brand Representatives

to earn commissions.  For example, Summit would "routinely adjust[] the percentage of gross

sales from a given product that would be counted toward earning a commission."  (*Id.* ¶ 54).  In

addition, Summit would assign Brand Representatives to stores "that made it nearly impossible

to earn commissions" and to products that were "less desirable" to customers.  (*Id.* ¶¶ 56-57).

Given those factors, "it was impossible to prevent a negative balance" most weeks.  (*Id.* ¶ 58).

Therefore, "[t]o avoid being terminated . . . Brand Representatives would underreport their

hours."  (*Id.* ¶ 53).  The rationale was that the higher the Brand Representatives' total wage pay,

the higher their sales targets and the more likely it would be they would end up with a negative

ledger balance.  (*Id.*).

      According to the complaint, one task that was rarely reported on the timesheets of Brand

Representatives was "setting up inventory and promotional displays prior to . . . shifts."  (*Id.* ¶

61).  Brand Representatives would perform those tasks on days they were not scheduled to work.

(*Id.* ¶ 62).  Brand Representatives also spent time after their shifts putting away inventory and

cleaning their work stations, which they would not report.  (*Id.* ¶ 63).  Similarly, Brand

Representatives would not report time spent on mandatory conference calls, which were

scheduled three to four times per week and could each last more than an hour.  (*Id.* ¶ 64).

Moreover, absenteeism was a chronic problem at Summit, requiring Brand Representatives to pick up extra shifts for which they were not compensated.  (*Id.* ¶ 65).

The complaint alleges that as a result, Brand Representatives would commonly work seven days per week and more than 50 hours per week.  (*Id.* ¶¶ 66-67).  Summit is alleged to have been aware of and encouraged these labor practices.  (*Id.* ¶¶ 68-70).

### B.      Procedural Background

The complaint in this case was originally filed in the District of Maryland.  On April 17, 2018, the parties agreed to transfer the case to this district.

The complaint asserts five claims against Summit.  Count 1 asserts a claim for violation of the FLSA for failure to pay overtime wages.  (Compl. ¶¶ 108-13).  Count 2 asserts an analogous claim under the Maryland Wage and Hour Law.  (*Id.* ¶¶ 114-20).  Count 3 asserts an analogous claim under the New York Labor Laws.  (*Id.* ¶¶ 121-27).  Count 4 asserts an analogous claim under the Pennsylvania Minimum Wage Act.  (*Id.* ¶¶ 128-33).  Count 5 asserts a claim under the Maryland Wage Payment Collection Law for failure to pay wages owed.  (*Id.* ¶¶ 134-38).  It is undisputed that liability for Counts 2 through 5 is predicated on a violation of the FLSA.

Plaintiffs moved to conditionally certify a FLSA action on December 13, 2018. Defendant moved to dismiss the complaint for failure to state a claim on January 18, 2019, contending that the outside sales exemption ("OSE") in the FLSA applies, and therefore plaintiffs are not subject to the FLSA's overtime-pay requirements.  Because the parties do not dispute that the state laws in question are analogous to the FLSA, the motion to dismiss turns on the applicability of the OSE.  The Court will first address the motion to dismiss before turning to

the motion for conditional certification.

## II.     Motion to Dismiss

### A.     Legal Standard

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### B.     Statutory and Regulatory Framework of the Outside Sales Exemption

Section 207(a) of the FLSA requires employers to pay qualified employees overtime wages. *See* 29 U.S.C. § 207(a).  However, Section 213(a), entitled "Minimum Wage and Maximum Hour Requirements," specifies that an employee working "in the capacity of outside salesman" is not subject to that provision. *Id.* § 213(a)(1).  Congress did not define "outside salesman," delegating that responsibility to the Department of Labor ("DOL"). *See id.*

The DOL has defined "outside salesman" to mean an employee "(1) whose primary duty is (i) making sales within the meaning of [29 U.S.C. § 203(k)], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500.  Section 203(k) in turn defines sales to mean "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).

However, the DOL has also drawn a distinction between an outside salesperson, who is exempt from the FLSA overtime wage requirement, and an individual who performs "promotional work," who is not exempt.  The DOL regulation states as follows:

> Promotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work . . . .  Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work.  On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.

29 C.F.R. § 541.503(a).  As an example, the DOL regulation states that "[p]romotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work."  *Id.* § 541.503(b).  Similarly, where the employee "does not consummate the sale" or make "direct efforts toward the consummation of a sale, the work is not exempt outside sales work."  *Id.* § 541.503(c).

###   C.   Analysis

Defendant contends that plaintiffs were "outside salesmen" such that they were not entitled to overtime pay as required under the FLSA.  The parties do not dispute that plaintiffs were not "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer."  29 C.F.R. § 541.500(a)(1)(ii).  Nor do the

parties dispute that plaintiffs were "regularly engaged away from the employer's place or places of business" in performing their duties. *Id.* § 541.500(a)(2). Accordingly, whether the OSE applies turns on whether plaintiffs' primary responsibility was "making sales" within the meaning of 29 U.S.C. § 203(k), as defendant contends.

The starting point in the analysis is *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012). In *Christopher*, the plaintiffs were pharmaceutical sales representatives, or "detailers," responsible for "calling on physicians in an assigned sales territory to discuss the features, benefits, and risks of an assigned portfolio of [the employer's] prescription drugs." *Id.* at 151. The plaintiffs' "primary objective was to obtain a nonbinding commitment from the physician to prescribe those drugs in appropriate cases." *Id.* (footnote omitted). The district court granted summary judgment to the defendant, finding that the OSE applied. *Id.* at 152. On appeal, the DOL submitted an amicus brief urging reversal, "contending that the District Court had erred in failing to accord controlling deference to [the agency's] interpretation of the pertinent regulations" under *Auer v. Robbins*, 519 U.S. 452 (1997). *Id.*[2] Specifically, the DOL argued that "pharmaceutical detailers are not exempt outside salesmen." *Id.* at 153.[3]

The Supreme Court ultimately held that the pharmaceutical sales representatives were in fact outside salesmen exempt from the FLSA's overtime wage requirement. It stated that the DOL's interpretation was "neither entitled to *Auer* deference nor persuasive in its own right." *Id.*

---

[2] "The canonical formulation of *Auer* deference is that [courts] will enforce an agency's interpretation of its own rules unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 617 (2013) (Scalia, J., concurring in part and dissenting in part) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The Supreme Court has granted a writ of certiorari in *Kisor v. Wilkie*, No. 18-15 (U.S.), presumably to decide whether to overrule or modify *Auer*.

[3] As the Supreme Court noted, the DOL's reasoning for that proposition shifted over time. The DOL first argued to the Ninth Circuit that "a 'sale' for the purposes of the [OSE] requires a consummated transaction directly involving the employee for whom the exemption is sought." *Id.* at 154. At the Supreme Court, it argued that "[a]n employee does not make a 'sale' for purposes of the [OSE] unless he actually transfers title to the property at issue." *Id.* (first alteration in original).

at 161.  Analyzing the text of the FLSA and applicable regulations, the Supreme Court first noted

the statutory definition of "sale" in Section 203(k) was "introduced with the verb 'includes'

instead of 'means,'" suggesting that the definition was "not exhaustive." *Id.* at 162.  Second, the

court noted that the "list of transactions included in [Section 203(k)] is modified by the word

'any,'" which "is best read to mean 'one or some indiscriminately of whatever kind.'" *Id.*

(quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).  Third, the court noted that Section

203(k) included a "broad catchall phrase: 'other disposition.'" *Id.* at 163.  Taking these factors

together, the court reasoned that Congress intended to define sales broadly "to accommodate

industry-by-industry variations in methods of selling commodities." *Id.* at 164.  Even though the

plaintiffs were tasked with obtaining only "a nonbinding commitment from a physician to

prescribe [the defendant's] drugs," that type of arrangement was common in the pharmaceutical

industry, which had its own "unique regulatory environment." *Id.* at 165.   The court added that

the sales representatives bore the "external indicia" of salesmen—namely, that they (1) were

hired for their sales experience, (2) were trained to close sales calls by "obtaining the maximum

commitment possible" from physicians, (3) worked away from the office with minimal

supervision, and (4) were compensated at least in part through commissions.  *Id.* at 165-66.

Accordingly, the court concluded that the plaintiffs' primary responsibility was making sales,

such that they were subject to the OSE.

The Supreme Court further rejected the plaintiffs' argument that pharmaceutical sales

representatives were "nonexempt promotional employees who merely stimulate sales made by

others." *Id.* at 167.  The plaintiffs had argued that because they only obtained nonbinding

commitments and that other employees received the final drug orders, they were not salespeople.

*Id.*  The court rejected that as a "formalistic argument . . . inconsistent with the realistic approach

that the [OSE] is meant to reflect." *Id.* The Supreme Court recently reinforced that notion when it stated that exemptions to the FLSA, including the OSE, should not be construed narrowly. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

Since *Christopher*, at least three federal appellate courts have considered the scope of the applicability of the OSE. In *Killion v. KeHE Distributors, LLC*, the plaintiffs were "sales representatives" of KeHE, a distributor of specialty ethnic and health foods. 761 F.3d 574, 577-78 (6th Cir. 2014). However, four "layers of personnel" managed KeHE's client relationships. *Id.* at 578. KeHE's customer development team initiated a relationship with a client, the business development team "negotiate[d] the broad parameters of any overarching distribution contract," and the account managers helped determine which products would be sold and developed marketing "plan-o-gram[s]" for clients. *Id.* "[S]ales representative[s] [were] the on-the-ground contact for each individual store." *Id.* Despite the job title, however, sales representatives' day-to-day responsibilities entailed few actual sales—they would meet delivery trucks several times per week, "oversee the unloading of products," help stock KeHE's products, and "place orders for more products based on depleted inventory." *Id.* They were paid "entirely on commission" through a "byzantine" formula. *Id.*

The Sixth Circuit held that KeHE's sales representatives were not outside salesmen. It first determined that *Christopher* was of "limited import" because KeHE was not engaged in an industry that had a "unique regulatory environment," such as pharmaceuticals. *Id.* at 584. Next, it noted that the evidence (viewed in the light most favorable to the plaintiffs) showed that a jury could reasonably conclude that the "sales representatives" did not make sales. *Id.* Indeed, even if the sales representatives' placing orders to replenish stocks could be considered "sales," the "vast majority of [their] time [was] spent stocking and cleaning shelves." *Id.* at 585. The sales

representatives' commissions were also tied to stocking shelves. *Id.* And, KeHE's "own internal documents" showed that account managers were the true salespersons within the company, not the sales representatives. *Id.* at 586.

The Eighth Circuit reached a similar conclusion in *Beauford v. ActionLink, LLC*, 781 F.3d 396 (8th Cir. 2015). In that case, the plaintiffs were "Brand Advocates" for ActionLink, a marketing services provider. *Id.* at 399. Brand Advocates were tasked with "visit[ing] retail stores, [training] the retail stores' employees on how [ActionLink's client's] electronics worked, and [convincing] those employees to recommend [the client's] products to customers." *Id.* Brand Advocates were provided scripts, PowerPoint presentations, and other promotional materials to use for their assigned geographical areas, which encompassed approximately 20 stores apiece per week. *Id.* However, Brand Advocates "did not sell directly to customers or to retail stores." *Id.*

The Eighth Circuit, like the Sixth Circuit in *Killion*, reasoned that *Christopher* was of limited import because "the world of consumer electronics is not subject to a 'unique regulatory environment' that requires a recommendation from a licensed professional to obtain a product." *Id.* at 403. The court then concluded that Brand Advocates were primarily engaged in "promotional activities designed to stimulate sales that will be made by someone [else]"— namely, the retail store's own employees. *Id.* (alterations, internal quotation marks, and citation omitted). Accordingly, the court held that the primary responsibility of the Brand Advocates was not making sales and that the OSE did not apply.

More recently, however, the Second Circuit took a different tack in *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2d Cir. 2018). In *Flood*, the plaintiffs "were employed to engage in door-to-door solicitation to persuade customers to buy their electricity or natural gas from Just

Energy." *Id.* at 223.  "When engaged in door-to-door solicitation efforts, [plaintiffs] wore a company badge and followed a company script."  *Id.* at 224.  The plaintiffs were compensated entirely through commissions.  *Id.* at 225-26.

The Second Circuit found that *Christopher* was applicable, despite the differences between the pharmaceutical and utility industries.  *Id.* at 230-31.  It reasoned that *Christopher* instructed lower courts to adopt "a functional, rather than a formal, inquiry."  *Id.* at 231 (quoting *Christopher*, 567 U.S. at 161 (internal quotation marks omitted)).  Moreover, the Second Circuit noted that "[t]he touchstone for making a sale, under the Federal Regulations, is obtaining a commitment."  *Id.* (quoting *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008) (internal quotation marks omitted)).  Because the plaintiffs obtained such commitments from customers to purchase their energy needs from Flood, the court held that they were quintessential salesmen.  *Id.*

In this case, Summit contends that "[p]laintiffs' primary duty was making sales because their job was to convince customers to purchase particular products by demonstrating the products, answering questions[,] or providing samples if possible."  (Def. MTD Mem. at 8). Defendant further argues that while plaintiffs were also tasked with other duties, such as setting up and dissembling displays, those tasks were "peripheral."  (Def. MTD Reply at 2).  In light of *Christopher* and *Encino Motorcars*, defendant argues that the operative phrase "making sales" should be read expansively to encompass all of plaintiffs' non-peripheral tasks.  (Def. MTD Mem. at 8-9).

Plaintiffs counter that cashiers employed by Summit's clients were "solely responsible for processing [customer] purchases."  (Pls. MTD Mem. at 3).  They reason that their responsibilities "solely consisted of performing product demonstrations and handing out

samples," such that they were promoters rather than salesmen. (*Id.*). In addition, plaintiffs

contend that *Christopher* is inapposite because that case concerned "unique facts regarding what

constitutes a sale in the pharmaceutical industry." (*Id.* at 11).

In any event, at this stage the Court need not decide the extent to which *Christopher*

applies in situations where the relevant industry does not face a "unique regulatory

environment." Put simply, without a factual record, the Court cannot ascertain whether

plaintiffs' "primary responsibility" was "making sales" or conducting promotional work. *See* 29

C.F.R. § 541.500.[4] Presumably, the Brand Representatives never actually rang up a sale at the

cash register. But what about inducing the customer to put the item in his or her shopping cart?

Is that analogous to obtaining a commitment from the customer to purchase the product? *Cf.*

*Flood*, 904 F.3d at 231. And what percentage of time was spent by Brand Representatives on

their various duties, such as making sales pitches or setting up promotional displays?[5]

The development of a factual record is necessary to answer those types of questions. In

all likelihood, of course, the issues will be revisited on summary judgment. In the meantime,

---

[4] The facts as pleaded fall closer to *Killion* and *Beauford* than *Flood*. Like the plaintiffs in *Killion*, Brand Representatives are alleged to have performed a multitude of duties that have little to do with actual sales—for example, setting up displays, demonstrating products, and handing out samples at retail stores. (*Compare* Compl. ¶¶ 32-36 *with Killion*, 761 F.3d at 578-79). And, like the *Beauford* plaintiffs, Brand Representatives plausibly "simply promoted products so employees of [client] retail stores could make sales." (*Compare* Compl. ¶¶ 33 & n.3 *with Beauford*, 781 F.3d at 403). Moreover, unlike the plaintiffs in *Flood*, Brand Representatives did not go door-to-door soliciting sales and were compensated primarily through wages rather than commissions. (*Compare* Compl. ¶¶ 40-49 *with Flood*, 904 F.3d at 225-26).

To be sure, as defendant notes, there are some important factual distinctions between *Killion* and *Beauford* and this case. For example, the *Killion* and *Beauford* plaintiffs rarely interacted with customers directly, whereas the complaint here alleges that the Brand Representatives made sales pitches directly to customers. (*Compare* Compl. ¶ 32 *with Beauford*, 781 F.3d at 399-400 and *Killion*, 761 F.3d at 578).

[5] In their opposition memorandum, plaintiffs also contend that they lack the "external indicia" of salespeople, as set forth in *Christopher*. (Pls. MTD Mem. at 16). Again, those indicia are that the salesperson (1) was hired for his sales experience, (2) trained to close solicitations by obtaining the maximum commitment possible from the customer, (3) worked away from the office with little supervision, and (4) was compensated in part through commissions. *Christopher*, 567 U.S. at 165-66. However, the Supreme Court's mention of "external indicia" was *dicta*, and in any event "secondary to the . . . primary analysis of whether the 'making sales' requirement was satisfied in the first place." *Flood*, 904 F.3d at 233. Accordingly, the Court declines to consider those factors at this stage of litigation, without a factual record.

however, the complaint plausibly alleges the existence of an employment relationship not

covered by the OSE.  Accordingly, the motion to dismiss will be denied.

**III.**    **Motion for Conditional Certification**

FLSA "[c]ollective actions were created to promote the 'efficient adjudication of similar

claims, so similarly situated employees, whose claims are often small and not likely to be

brought on an individual basis, may join together and pool their resources to prosecute claims.'"

*Iriarte v. Café 71, Inc.*, 2015 WL 8900875, at *2 (S.D.N.Y. Dec. 11, 2015) (quoting *Lynch v.*

*United States Auto Ass'n*, 491 F.Supp.2d 357, 367 (S.D.N.Y. 2007)); *see also Skirchak v.*

*Dynamics Research Corp.*, 508 F.3d 49, 58 (1st Cir. 2007) ("The Supreme Court has noted that

the FLSA itself is meant to offset the superior bargaining power of employers both for particular

employees at issue and broader classifications, and to offset the resulting general downward

pressure on wages in competing businesses." (citing *Tony & Susan Alamo Found. v. Sec'y of*

*Labor*, 471 U.S. 290, 302 (1985))).   "Unlike . . . Rule 23 class actions, FLSA collective actions

require similarly situated employees to affirmatively opt-in and be bound by any judgment."

*Iriarte*, 2015 WL 8900875, at *2 (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 542 (2d Cir.

2010)).  It is well-established that the FLSA "states clearly that actions brought for violation of

the Act cannot be brought as [Rule 23] class actions," and instead, "must be brought [as opt-in

collective actions] pursuant to the procedures in [29 U.S.C. § 216]."  *Trezvant v. Fidelity Emp'r*

*Servs. Corp.*, 434 F. Supp. 2d 40, 57 (D. Mass. 2006).

Where, as here, plaintiffs seek to exercise their right to bring suit on behalf of others,

district courts may facilitate the process of sending notice to others who may be similarly

situated.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171-72 (1989).  While the First

Circuit has not addressed the issue, most courts—including most district courts in this circuit—

follow a two-step approach to determine whether to issue notice. *See Trezvant*, 434 F. Supp. 2d at 43. Under this approach, "the court makes an initial determination of whether the potential class should receive notice of the pending action and then, later, after discovery is complete, the court makes a final 'similarly situated' determination." *Id.* at 42 (citation omitted). Plaintiffs here seek an initial determination that notice of the lawsuit should issue to the several hundred Brand Representatives.

The standard for this initial determination is "fairly lenient" and "typically results in conditional certification of the representative class." *Id.* at 43. To issue notice, plaintiffs need only show that there is "some factual support"—as opposed to mere allegations—that the potential plaintiffs are similarly situated. *See Melendez Cintron v. Hershey P.R., Inc.*, 363 F. Supp. 2d 10, 16 (D.P.R. 2005) (following view of "most courts" that plaintiffs must show "some factual support for the allegations [that others are similarly situated] before [issuing] authorization of notice.").

Here, plaintiffs have easily satisfied this standard.[6] They have submitted 16 affidavits from Brand Representatives attesting that they all had the same responsibilities.[7] The 16 affidavits also attest that Brand Representatives worked similar hours and were paid in the same manner—specifically, an hourly wage, with the possibility of some commission.[8] Moreover, the affidavits further attest that Brand Representatives were subject to a compensation scheme that encouraged them to underreport hours.[9]

---

[6] And, in any event, defendant has not opposed the motion for conditional certification.

[7] *See* Modeski Aff. ¶¶ 6-9; Damboise Aff. ¶¶ 6-9; Stearns Aff. ¶¶ 6-9; Prettyman Aff. ¶¶ 6-9; Bahaman Aff. ¶¶ 6-9; Finkelstein Aff. ¶¶ 6-9; Brekka Aff. ¶¶ 6-9; Vancleave Aff. ¶¶ 6-9; Courtney Aff. ¶¶ 6-9; Webb Aff. ¶¶ 6-9; Money Aff. ¶¶ 6-9; Mayo Aff. ¶¶ 6-9; Pace Aff. ¶¶ 6-9; Williams Aff. ¶¶ 6-9; King Aff. ¶¶ 6-9; Guerrieri Aff. ¶¶ 6-9.

[8] *See id.* ¶¶ 10-13.

[9] *See id.* ¶¶ 18-27.

Accordingly, the motion for conditional certification will be granted.  *See Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 215 (D. Mass. 2001) (holding that evidence suggesting employer treated all employees in certain position as exempt from FLSA overtime requirements is sufficient to determine they are "similarly situated" for purpose of issuing court-facilitated notice).

## IV. <u>Conclusion</u>

For the foregoing reasons, defendant's motion to dismiss is DENIED.  Plaintiffs' motion for conditional certification is GRANTED.  It is hereby ORDERED that defendant shall produce to counsel for plaintiffs the names and last known addresses of the conditionally certified collective action members within 21 days of this order.

**So Ordered.**


/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated:  April 16, 2019                        United States District Judge