**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOSEPH MODESKI, et al., on behalf of
themselves and all others similarly situated,

Plaintiff,

v.

SUMMIT RETAIL SOLUTIONS, INC.,

Defendant.

Civil Action No.  1:18-cv-12383-FDS

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.     FACTUAL BACKGROUND ........................................................................................ 2

       A.     Summit ........................................................................................................ 2

       B.     Brand Representatives ................................................................................. 2

       C.     Named Plaintiffs ......................................................................................... 2

       D.     Summit's Sales Training ............................................................................. 3

       E.     Plaintiffs' Approach to Making Sales ........................................................ 4

       F.     Plaintiffs' Ancillary Duties ........................................................................ 5

       G.     Plaintiffs' Compensation:  Hourly Wages, Overtime and Commissions ............... 6

       H.     Plaintiffs Regularly Received Commission Pay ......................................... 6

II.    PROCEDURAL BACKGROUND ............................................................................... 7

III.   ARGUMENT AND AUTHORITIES .......................................................................... 8

       A.     Applicable Standards .................................................................................. 8

              1.     The Summary Judgment Standard .................................................. 8

              2.     The Outside Sales Exemption ......................................................... 9

       B.     Plaintiffs' Primary Duty Was Making Sales ............................................. 9

       C.     Plaintiffs Bear All External Indicia of Salespeople ................................ 13

       D.     Handling Cash Is Not the *Sine Qua Non* of Making Sales ..................... 15

       E.     Any Promotional Work Performed Was in Support of Plaintiffs' Own
              Sales .......................................................................................................... 16

       F.     *Christopher* Is Not Limited to Highly Regulated Industries ................... 18

       G.     In the Context of a Wholesale Club, Plaintiffs' Efforts Were "Making
              Sales" ........................................................................................................ 19

       H.     Plaintiffs Were Customarily and Regularly Outside  Summit's Place of
              Business while Making Sales ..................................................................... 19

IV.    CONCLUSION ........................................................................................................... 20

Discovery has confirmed that Plaintiffs[1] were quintessential outside sales people and subject to the Fair Labor Standards Act's ("FLSA") outside sales exemption ("OSE"), which has only two elements: (1) a primary duty of making <u>sales</u>, and (2) performing such work <u>outside</u> the employer's places of business. Plaintiffs conceded at the pleadings stage that the Brand Representatives at issue in this litigation did not work at any facility owned or controlled by Defendant Summit Retail Solutions, Inc. ("Summit" or the "Company").[2] The only live question is thus whether Brand Representatives are engaged in "sales" when they interact with customers inside wholesale clubs or other retail locations and attempt to persuade those customers to buy Summit's products. Even the limited discovery conducted to date leaves room for only one answer to that question. Throughout their depositions, Plaintiffs referred to their job as "making sales" and described at length how they used persuasive sales techniques to convince customers to buy products (or buy more products) on impulse, the very essence of sales.

Notwithstanding their unequivocal admissions that they made sales away from Summit's place of business, Plaintiffs appear poised to argue that they are not subject to the OSE simply because they did not engage in the mundane activities of handling currency or operating a cash register. As decisions applying the OSE make clear, however, the exemption does not require employees to accept currency from customers. Under the Supreme Court's "functional" definition of the OSE, the persuasive activity in which Brand Representatives engage is the very definition of "making sales," and Plaintiffs are exempt outside sales personnel as a matter of law.

---

[1] The present motion pertains to the claims of Named Plaintiffs Modeski, Zammito, Damboise, Ortiz, and Wolfert.  In the event that any aspect of Plaintiffs' claims survive the present motion, Defendant reserves all rights to seek decertification of the FLSA collective in this matter and to pursue all of the defenses it has pled as to participants in this action.  (Dkt. 143).

[2] *See* Order Denying Motion to Dismiss, Dkt. 89 at 7-8 (noting that the parties do not dispute that Plaintiffs were regularly engaged away from Summit's place of business and "[a]ccordingly, whether the OSE applies turn on whether plaintiffs' primary responsibility was 'making sales'").

## I.     FACTUAL BACKGROUND

### A.     Summit

Summit's business is to sell products through face-to-face, impulse sales at retail locations throughout the country. Statement of Undisputed Facts ("UF") at ¶¶1-2. Summit has two sets of corporate business partners: (1) retailers, who are seeking to maximize the use of their sales space; and (2) manufacturers seeking to sell their products to a broad base of customers.  UF ¶¶1, 3, 5. The Company's primary mode of sales is by performing short-term "road shows," sometimes called simply "shows," in the high-traffic space of its retail partners for limited periods of time. UF ¶1. Generally, Summit purchases merchandise from manufacturers and sells that merchandise in the clubs maintained by its retail clients, rather than selling merchandise owned by one of its business partners. *See* UF ¶3. At the conclusion of each show, Summit generally ships its unsold product away from the retailer's facility to be sold or otherwise disposed of elsewhere. UF ¶4.

### B.     Brand Representatives

In order to put on road shows and sell products, Summit employs Brand Representatives and Senior Brand Representatives (together, "Brand Representatives"). UF ¶2. Summit trains its Brand Representatives to pitch Summit's products to retail consumers using various proven sales techniques designed to maximize impulse buying. UF ¶17. Brand Representatives work on-site at major wholesale clubs, such as BJ's, Costco, and Sam's Club. UF ¶31. Brand Representatives spend little, if any, time in any facility operated or controlled by Summit and generally are not subject to line-of-sight supervision by any representative of Summit. UF ¶¶31-33.

### C.     Named Plaintiffs

Plaintiffs worked as Brand Representatives for Summit for varying periods of time between October 2014 and January 2018. First Amended Complaint ¶¶ 11-15. During their tenures with Summit, each of the Plaintiffs worked exclusively on location at the stores operated by Summit's

retail business partners in order to sell a variety of products. UF ¶31. Plaintiffs regularly moved from store-to-store to perform "shows" that lasted two consecutive weeks of approximately four days each. UF ¶1. All of the Plaintiffs admit that they engaged in persuasive sales techniques in the course of these shows for the purpose of convincing customers to make immediate purchases on impulse. UF ¶¶9-14, 16. Of the five Plaintiffs, only Plaintiff Modeski ever set foot in premises maintained by Summit, which was on one or two occasions for training. UF ¶32.

### D.    Summit's Sales Training

Plaintiffs received extensive sales training throughout their employment with Summit. Through formal classroom training, role playing, job shadowing, peer mentoring, and direct feedback, Plaintiffs learned about Summit's proprietary sales techniques, which are designed to harness customers' impulsivity and the "law of averages," the concept that to drive sales activity, Plaintiffs needed to engage as many potential customers as possible. UF ¶¶17-18. For example, Plaintiffs learned tricks and techniques to get a potential customer's attention, describe a product to the customer in an enticing manner, and convey urgency to the customer because the product was only available from Plaintiff's in-store display and only available for a limited time.[3] UF ¶22-23. Summit also taught Plaintiffs the technique of "assuming the sale" by placing the product in the customer's shopping cart or hand, and taught them techniques designed to overcome customers' reservations about the product. UF ¶¶ 19, 16. Plaintiffs also learned to increase their sales per customer by convincing customers to upgrade to a higher-priced bundle or buy multiple items. UF ¶¶27-28 . In short, Plaintiffs were trained to make sales by convincing customers to walk away from their display with one or more of Summit's products in their cart. UF ¶¶10, 19, 27.

---

[3] Generally speaking, the products Plaintiffs sold were not available on the retailers' shelves and instead were only available at each Plaintiff's display table or nearby temporary storage space during the four-day "show."  UF ¶5.

Plaintiffs understood these activities to be making "sales." Plaintiff Ortiz, for example, described his Summit duties as "event-based sales," agreed that his goal was to "move product," and testified that he was promoted in part because he exceeded his "sales goals". UF ¶¶ 11, 30. Plaintiff Wolfert testified that he understood that he was "a salesman," described his role at Summit as a "manager [of a] national sales force," and agreed that making sales was the most important part of his job. UF ¶13. Plaintiff Zammito acknowledged that "his number one responsibility" was to "drive sales" and that he would engage in direct conversations about products with approximately 40 to 50 individual customers each day. UF ¶14.

### E.  Plaintiffs' Approach to Making Sales

In the course of their employment as Summit Brand Representative, each Plaintiff spoke directly with prospective customers, individually or in a group, in an effort to convince them to purchase the products that the Brand Representative was assigned to sell. UF ¶16. In so doing, each Plaintiff applied specialized training designed to foster effective conversations with customers and ultimately get the customer to purchase the product. UF ¶¶17-29. Plaintiffs found Summit's sales training effective and used it in their work. UF ¶¶22-29. Plaintiff Ortiz  testified that he "used the law of average [himself] as far as putting the product in people's hand." UF ¶24. Similarly, Plaintiff Wolfert capitalized on customer impulse by adding signs to his display that said "last day" and "Blowout Sale" as a "sales trick." UF ¶23.

Plaintiffs' own descriptions of their individual sales techniques further illustrates the persuasive activity in which they engaged. Plaintiff Modeski explained how he would convince customers to buy products: "So if you had somebody who, you know, had a couple of extra questions, or wasn't initially sold, then you just had to, you know, converse with them on why they should [purchase the product]." UF ¶25. Plaintiff Ortiz sold high-value items by "hav[ing] a nice conversation with the person about the product," and employed his Summit sales training by

emphasizing the limited availability of the product, telling the customers that he "was only here once a year" or "Sunday is our last day." UF ¶23. Plaintiff Damboise encouraged customers to sample different types of the food products he was selling in order to "get them to admit that they like it" and thus feel compelled to buy. UF ¶25. Plaintiff Zammito invited customers over to his display to try his products by "be[ing] very friendly, hav[ing] nice back and forth conversations" and by "push[ing] how much of a bargain" the products were. UF ¶¶22, 25. Plaintiff Wolfert invited customers over to feel the pillows that he was selling and then talked to the customers about "what the benefits and negatives of having this pillow versus another pillow [were.]" UF ¶25.

Plaintiffs understood that their job performance was evaluated based on the sales revenue they individually produced. UF ¶¶13, 30, 36. In fact, Plaintiffs kept track of their individual sales numbers on a daily basis in order to gauge their own performance from day-to-day. UF ¶36. Based on their strong sales performance, four of the Plaintiffs were promoted to Senior Brand Representative. UF ¶30.[4]

### F.    Plaintiffs' Ancillary Duties

Plaintiffs performed certain other ancillary tasks to support their own sales efforts, including managing their product inventories, coordinating the set up and dismantling of their displays, and participating in conference calls. UF ¶42. Generally speaking, Summit shipped inventory to the retail client locations and Plaintiffs were expected to count their inventory at the beginning of a show and again at the end. UF ¶43. At the end of each show, Plaintiffs were expected to pack most of the remaining inventory and leave it at the client location for Summit's

---

[4] Plaintiffs continued to make sales after their promotion, but were also responsible for teaching new employees to be effective sales people.  UF ¶2 (citing Senior Brand Representative Job Description).

inventory team to process. UF ¶43.[5] These duties were ancillary to and in support of Plaintiffs'
primary job duty of making sales to customers. UF ¶¶44-45.

### G.       Plaintiffs' Compensation:  Hourly Wages, Overtime and Commissions

Plaintiffs were paid an hourly wage for all hours worked (with differing base rates for
differing activities) and overtime at time and one-half for all hours worked in excess of 40 in any
workweek. UF ¶34.[6] Plaintiffs also received commissions, after their sales exceeded an amount
necessary to offset their base hourly rate. UF ¶35. If a Plaintiff's sales in a given week generated
sufficient commissions to exceed his hourly wages in that week, the difference was added to the
Plaintiff's commission ledger for that week. *Id.* If a Plaintiff's sales in a given week generated less
commissions than his hourly wages, the negative balance was applied to the Plaintiff's commission
ledger for that week. *Id.* Approximately every four weeks, Summit conducted a commission "true-
up" and paid out the commission balance, if any, owed to each Brand Representative for that
period. *Id.*

### H.       Plaintiffs Regularly Received Commission Pay

In their Complaint, Plaintiffs alleged that they "rarely, if ever" received commissions. First
Amended Complaint ¶ 43. This assertion does not survive scrutiny, as Plaintiffs admitted that they
regularly received commissions. Plaintiff Modeski described the allegation in his Complaint as not
true "for [him] personally," and he acknowledged receiving a commission for more than half of

---

[5] While the Complaint alleges that Brand Representatives picked up product from inventory
warehouses, Complaint ¶ 35, none of the Plaintiffs testified that they did so.

[6] Defendant instructed each Plaintiff to record his time accurately and to record all hours worked
each day, including time attending conference calls and performing set up and breakdown.  UF
¶46.  Summit's timekeeping policy includes detailed instructions about how to accurately record
time worked.  *Id.*  Defendant instructed each Plaintiff to review his "show file" each week (which
included his time logged per code per day, his sales, his commission and true up) and notify his
manager or human resources of any changes.  *Id.*

the true-up periods during his employment with Summit. UF ¶¶ 37, 41.  Plaintiff Damboise

acknowledged the allegation was "not accurate" as to his employment and testified that he received

commissions during *every month* of his employment. UF ¶¶ 40, 41.  Plaintiff Ortiz testified that

he received commissions "probably six times" out of the fourteen months that he worked for

Summit. UF ¶38. Plaintiff Wolfert received multiple, substantial commissions during his

employment with Summit. UF ¶38. Plaintiff Zammito received commissions for approximately

half of the months of his employment with Summit. UF ¶39.

## II.    PROCEDURAL BACKGROUND

Plaintiffs Modeski, Zammito and Damboise filed their Complaint on April 17, 2018

asserting claims under the FLSA, and analogous Maryland, New York and Pennsylvania wage

laws. (Dkt. 1). On October 18, 2019, Plaintiffs moved to amend their complaint to add Plaintiffs

Ortiz and Wolfert as Named Plaintiffs and to add class claims pursuant to Ohio and New Jersey

law. *See* Plaintiffs' Consent Motion for Leave to File an Amended Complaint (Dkt. 134).[7]

Plaintiffs moved for conditional certification of an FLSA collective action on December

13, 2018 (Dkt. 71), which the Court granted on May 15, 2019 (Dkt. 99), ultimately resulting in a

conditional collective of 392 individuals, including Named Plaintiffs and opt-in plaintiffs.[8]

On January 29, 2020, the parties reported that they believed the record was sufficiently

developed to allow the Court to assess Plaintiffs' exempt status without further discovery. (Dkt.

142). The Court ordered that motions for summary judgment on the OSE be filed by March 20.

---

[7] Although the amendment was unopposed, Plaintiffs filed it as a motion to amend, as opposed to
simply filing the First Amended Complaint.  The motion to amend is still pending, and Defendant
will timely respond when the First Amended Complaint is accepted and docketed.

[8] Fifty (50) plaintiffs were dismissed from the lawsuit without prejudice pursuant to the parties'
agreement because their claims are subject to arbitration.  (Dkt. 104, 133).  Two other opt-in
plaintiffs have withdrawn their consent to be parties to this lawsuit.  (Dkt. 122, 131).

(Dkt. 143). Summit moves for summary judgment on the exempt status of the five Plaintiffs.[9]

## III.    ARGUMENT AND AUTHORITIES

### A.    Applicable Standards

#### 1.    The Summary Judgment Standard

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Sensing v. Outback Steakhouse of Fla.*, 575 F.3d 145, 152 (1st Cir. 2009) (quotation omitted). The opposing party must then "come forward with facts that show a genuine issue for trial," bearing the burden of "set[ting] forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [they] would bear the ultimate burden of proof at trial." *Id.* Plaintiffs may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *DeNovellis*

---

[9] Because Plaintiffs are exempt under the FLSA, summary judgment is appropriate as to Plaintiffs' parallel state law overtime claims, as well. *See e.g.*, *Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 603 (4th Cir. 2017) ("The FLSA and the Maryland statutory schemes are largely congruent, and ordinarily claims brought pursuant to the MWHL succeed or fail together with claims brought under the FLSA."); *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 215 (N.D.N.Y. 2002) ("[T]he ensuing analysis focuses solely on federal law, but applies equally to Plaintiff's claims under the FLSA and New York State law."); *Perkins v. S & E Flag Cars, LLC*, No. 2:15-CV-975, 2017 WL 1093279, at *2 (S.D. Ohio Mar. 22, 2017) ("Claims brought under § 4111.03(A) of the Ohio Wage Act are governed by the same standards as the FLSA … [a]ccordingly, the Court addresses the challenges to Plaintiffs' FLSA and Ohio Wage Act claims together."). *See also* Md. Code Regs. § 09.12.41.13 ("'Outside salesman' has the meaning stated in 29 CFR §541.500 et seq."); *Torrenegra v. Grameen Am., Inc.*, 2017 WL 1401291, at *7 (E.D.N.Y. April 19, 2017) (New York "applies functionally the same definition [of outside salesman as the FLSA]"); N.J. Admin. Code tit. 12 § 56-7.2(a) (". . . the provisions of 29 CFR Part 541 [defining the FLSA's white collar exemptions] are adopted herein by reference."); Ohio Rev. Code Ann. § 4111.03(D)(3)(d) ("'Employee' . . . does not include any individual employed as an outside salesperson compensated by commissions . . . as such terms are defined by the [FLSA].."); 43 Pa. Stat. Ann. § 333.105 (promulgating exemption for individual employed "in the capacity of outside salesman[.]"); 34 Pa. Code § 231.85 ("Outside salesman means an employee . . . customarily and regularly engaged more than 80% of work time away from the employer's place or places of business . . . [m]aking sales . . .").

*v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997).

### 2.    The Outside Sales Exemption

The FLSA's outside sales exemption is subject to a simple, two-part test:  each Plaintiff is exempt if he (1) had a "primary duty" of "making sales"; and (2) was "customarily and regularly engaged [in making sales] away from the employer's place of business."  29 C.F.R. § 541.500(a).[10] Whether Plaintiffs meet the requirements of the OSE is a question of law. *Holden v. Cenpatico Behavioral Health, LLC*, No. CV 15-14119-JCB, 2017 WL 10525889, at *6  (D. Mass. Sept. 22, 2017). As the Supreme Court has explained, FLSA exemptions must be "fairly" construed, not narrowly interpreted, as some lower courts had previously held. *Encino Motorcars, LLC v. Navarro*, 38 S. Ct. 1134, 1142 (2018). Courts "have no license to give the exemption anything but a fair reading." *Id*.

### B.    Plaintiffs' Primary Duty Was Making Sales

The undisputed facts establish that each Plaintiff's primary duty was selling products to customers. The regulatory definition of "making sales" under the OSE is broad. 29 C.F.R. § 541.501(b) ("'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition"). The Supreme Court has prescribed a "functional" or "realistic" definition of "making sales." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161, 167 (2012) (sales, for purposes of the OSE, is construed broadly and not limited to individuals processing purchases for customers). In so doing, the Supreme Court made clear that the OSE applies "whenever an employee 'in some sense make[s] a sale,'" noting that the inquiry must take

---

[10]   The OSE does not require the payment of a minimum salary or any other particular form or quantity of compensation to covered employees. 29 C.F.R. § 541.500(c). "[T]he regulations do not indicate that a court should consider a salesman's effective compensation in determining whether the [outside sales] exemption applies."  *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 586 (5th Cir. 2013) (summary judgment for employer on OSE as applied to route salesman).

into account "an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher*, 567 U.S. at 149, 161. Relying on the U.S. Department of Labor's position that "[e]xempt status should not depend on technicalities," *id.* at 149, the Court concluded that even a non-binding commitment to prescribe certain drugs is "tantamount" to a sale for purposes of the OSE due to "Congress' intent to define 'sale' in a broad manner." *Id.* at 163-64 (quoting Dep't of Labor, Report & Recommendations of the President Officer at Hearing Preliminary to Redefinition, at 46 (1940)).

In reaching this conclusion, the Supreme Court rejected the theory of liability that Plaintiffs appear to advance in this matter and determined that the OSE does not require that an employee process a transaction or have authority to bind a customer to purchase the product. *Id.* The exemption does not depend on technicalities. *Christopher*, 567 U.S. at 149; *see also Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 229-30 (2d Cir. 2018) ("The Supreme Court . . . cautioned against the use of technicalities to defeat the application of the outside salesman exemption"). Rather, the analysis turns upon whether the employees obtain some commitment from customers to purchase the product they are selling. *Flood*, 904 F.3d 219, 231 ("it is [the] commitment [to buy] that suffices to constitute the making of a sale for purposes of the [OSE]").[11]

Here, the plain and sole purpose of each Plaintiff's job, as described in their own deposition testimony, was to obtain commitments from consumers to buy Summit's products. Each Plaintiff admitted that the purpose of his job was to speak directly with customers for the purpose of persuading them to purchase a specific product. For example, Plaintiff Ortiz testified a Brand Representative's "goal is to move product" and convince people to "take the product home." UF

---

[11] *See also* 69 Fed. Reg. 22122-01 ("Employees have a primary duty of making sales if they 'obtain a commitment to buy' from the customer and are credited with the sale.").

¶11. Plaintiff Wolfert, when asked whether he could "think of any other verb in the English language that would accurately describe" his success as a Brand Representative, other than that he "*sold* a lot of product," he answered: "No." UF ¶13. If customers raised objections to purchasing a product, Plaintiffs attempted to overcome those objections and persuade the customer to buy the product. Plaintiff Zammito testified that when customers objected, he would "try to understand why they didn't want [the pillow], see if it's about price or if it's about something else, and I would usually try to see if they have any issues sleeping, and if there's anything with our product that could help them with those issues." UF ¶26. If a customer said they had enough of the food product, Plaintiff Damboise "would tell them that they could freeze it" to overcome the customer's objection and make a sale. UF ¶26.

Plaintiffs did not sell or promote products other than the ones that were the subject of their road shows in the stores where their shows occurred, nor did they monitor sales of the host retailer generally. UF ¶6. Plaintiffs tracked the inventories and sales of only the particular products that they were responsible for selling. UF ¶7. There is no dispute that the vast majority of Plaintiffs' time was spent attempting to convince potential customers to buy the products that Plaintiffs were selling, using sales techniques that Summit taught them.

The post-*Christopher* case that bears most directly on the application of the OSE to the work Plaintiffs performed is the Second Circuit's decision in *Flood v. Just Energy Marketing,* which affirmed summary judgment for the employer on OSE grounds, noting that a plaintiff who sold energy plans door-to-door was making sales through his pitches to customers. 904 F.3d at 231 (plaintiff was engaged in sales because he "dealt directly with the party—face-to-face with the customer at the door—who would actually purchase [the employer's] product."). Similarly here, Plaintiffs' principal duty was to sell products by convincing the customers standing in front of

them in retail locations to buy an assigned product by extoling its virtues and overcoming objections and thus convincing the customers to take the product from Plaintiffs' display, pay for it, and take it home. UF ¶¶9-16. As Plaintiff Zammito recounted, he would "push how much of a bargain they were getting with [buying the product]" in conversations with customers, just as Plaintiff Damboise would "get them to admit that they like it" and purchase the product. UF ¶25. This persuasive activity is at the core of what it means to be "making sales."

At the motion to dismiss stage, Plaintiffs attempted to avoid the OSE by arguing that their job responsibilities amounted to mere product demonstrations. (Dkt. 78 at 3). The discovery record debunks that argument and reflects that Plaintiffs were engaged in direct sales pitches. Plaintiffs' duties were fundamentally different than those of the marketing personnel to whom they sought to analogize themselves by citing to *Beauford v. ActionLink LLC*, 781 F.3d 396 (8th Cir. 2015) and *Killion v. KeHE Distributor*s, 761 F.3d 574 (6th Cir. 2014). In *Beauford*, the plaintiffs travelled to the defendant's clients' stores to educate those stores' salespeople on the merits of products and make those salespeople more inclined and better able to sell those products directly to retail customers. *Beauford*, 781 F.3d at 399. The Eighth Circuit examined the context of these transactions (*i.e.*, consumer electronics sold at retail) and concluded that the employees at issue were not outside salesmen because they "simply promoted products so employees of retail stores could make sales," and that those retail sales personnel "engaged in the paradigmatic sale of [the products]—they convinced customers to choose a product[.]" *Id.* at 403. In stark contrast to the employees in *Beauford*, Plaintiffs were directly responsible for convincing customers to purchase products: they spoke directly to customers and persuaded them to buy products that were not otherwise available in the store, with no material involvement of employees of their retail hosts. UF ¶¶5, 9-16. Plaintiffs understood their success as Brand Representatives was measured by their

individual sales and received substantial commissions as a result of their sales, unlike the *Beauford* plaintiffs. UF at ¶36.

Plaintiffs have even less in common with the employees at issue in *Killion*, who travelled to retail stores and restocked inventories of those stores with their employer's products. *Killion*, 761 F.3d at 585. The *Killion* plaintiffs' responsibilities were limited to transporting products, maintaining proper inventory levels, and stocking and cleaning the shelves of defendant's retail clients. *Id.* The *Killion* plaintiffs did not generally interact with customers. Rather, the "vast majority of the plaintiffs' time [was] spent stocking and cleaning shelves[,]" and plaintiffs did not spend a great deal of time performing the only sales-related activity within their job responsibilities, placing orders for new inventory. *Id.* Plaintiffs here had almost nothing in common with the merchandisers in *Killion*. Plaintiffs spoke directly to customers, solicited their interest, and persuaded them to purchase a product that was not otherwise available on the retailer's shelves.[12] UF ¶¶5, 9-16, 22-29. It was the absence of such activities that led the Sixth Circuit to conclude there were issues of fact as to whether plaintiffs were "making sales." 761 F.3d at 583.

### C.   Plaintiffs Bear All External Indicia of Salespeople

While the test for the OSE includes only two elements, some courts have also looked to "external indicia" of sales person status in applying the exemption. *Beauford*, 781 F.3d at 403 ("Further, our result finds support in *Christopher's* discussion of the other indicia of outside salesmen."); *Hurt v. Commerce Energy*, 92 F. Supp. 683, 691–92 (N.D. Ohio 2015) (discussing external indicia). Such "indicia" are not in the text of the FLSA or the regulations defining the OSE, and are arguably not part of the test for exempt status. *Flood v. Just Energy Marketing Corp.*,

---

[12] Unlike the *Killion* plaintiffs, who were limited in the amounts they could sell, Summit trains Brand Representatives to sell as much product as possible. UF ¶21 (Wolfert testified that he was trained to get the customer to "buy as much as [they] can fit in [their] cart.").

904 F.3d at 233–234 ("[T]here is good reason to doubt the weight that any unwritten "external indicia" should be given when deciding if an employee is 'making sales' as defined under the outside salesman exemption").[13] However, to the extent the Court elects to consider these "indicia," Plaintiffs satisfy them.

In *Christopher*, the Supreme Court described external indicia of a salesman to include (1) being hired for sales experience, (2) being trained to close solicitations by obtaining the maximum commitment possible from the customer, (3) working away from the employer's facilities with little supervision, and (4) being compensated in part through commissions. As to the first factor, most Plaintiffs testified that they had sales experience from work they performed prior to joining Summit. UF ¶15. As to the second factor, each Plaintiff testified that he received substantial training from Summit that taught him to make sales by obtaining the maximum commitment possible from the customer. For example, Plaintiff Damboise would "assume the sale and testified that he would "try to put [the product] in their cart."  UF ¶19. In the context of Plaintiffs' jobs, the maximum commitment they could achieve was having the customer take the product from their display with the intention of purchasing it. UF ¶9. As one Plaintiff described, the product was "as sold as it was going to get" once the customer took the product from his in-store display. *Id*. As to the third factor, each Plaintiff admitted that he worked primarily off-site, away from Summit's offices, and was subject to minimal supervision. For example, Zammito only saw his supervisor on site "once or twice," and outside of occasional conference calls, Modeski "didn't have to . . . check in every single day." UF ¶33. Finally, as to the fourth factor, each Plaintiff admitted that he received substantial commissions. UF ¶¶37-41. All of the "external indicia" of salesperson status

---

[13] *See also Vasto v. Credico (USA) LLC*, 767 Fed. Appx. 54 (2d Cir. 2019) (describing indicia as "arguably dicta in *Christopher*.").

described in *Christopher* are established.

### D.   Handling Cash Is Not the *Sine Qua Non* of Making Sales

Plaintiffs appear to recognize that they were engaged in persuasive activity designed to convince customers to purchase Summit's products on impulse, and maintain that they are nonetheless nonexempt because they did not engage in the mundane activities of handling cash or ringing cash registers. (Dkt. 78 at 3). The fact that Plaintiffs did not process payments is immaterial, and their strained construction of the OSE is not viable. In the modern economy, many outside salesmen never accept direct payment from customers and still are properly subject to the OSE. *See, e.g., Youssef v. Direct Energy Bus. LLC*, NO. 2018-03809-BLS1 (Mass. Super. Feb. 28, 2020) (door-to-door salesman who sold energy services was subject to OSE, even though the products he sold were monthly-billed utility contracts).

Reliance on technicalities, such as an artificial requirement that employees actually handle cash to consummate a transaction, is not the proper application of the OSE. Rather, as the Supreme Court has instructed, the proper question is whether an employee has obtained a commitment from the customer to buy a product. *Christopher*, 567 U.S. at 165; *see also Flood* at 229 (rejecting argument that inability of salesman to "conclusively [ ] close the deal or bind the customer takes him outside the ambit of the outside salesman exemption"); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010) (employee "making specific sales to individual customers" as opposed to increasing sales generally is a salesperson under FLSA just as a clothing store employee "who assists customers in finding their size of clothing *or* who completes the transaction at the cash register is a salesperson under the FLSA") (emphasis added).

Defendant's research reveals only one other trial court decision that has entertained Plaintiffs' theory of cash handling as the *sine qua non* of making sales in the retail context, and that court rejected it and granted summary judgment to the employer on the OSE. *Moore v. Int'l*

*Cosmetics & Perfumes, Inc.*, 2016 WL 3556610, at \*2–3, 8 (C.D. Cal. June 24, 2016). In *Moore*, a perfumery placed employees in third-party department stores and trained those employees in techniques to persuade customers to buy its perfumes. *Id.* Upon convincing a customer to buy perfume, plaintiffs would escort the customer to the cashier, who would ring up the transaction. *Id.* As with Summit's Brand Representatives, the *Moore* plaintiffs did not process customers' purchases by accepting payment from the customers. *Id.* This had no impact on plaintiffs' primary duty of making sales because "[plaintiffs] directed their efforts at convincing individual customers to purchase specific [ ] products in order to meet their personal sales quotas, and they were to some extent rewarded for their success in doing so[, which] constitutes 'sales' activity for purposes of the [OSE]." *Id.* at \*7.

Similarly here, the fact that Plaintiffs did not themselves ring up the sale and accept payment from the customers does nothing to overcome the fact that Plaintiffs were responsible for the instigating transaction (*i.e.*, making the sale). Indeed, the court's conclusion in *Moore* seamlessly fits Plaintiffs' case: the Plaintiffs directed their efforts at convincing individual customers to purchase Summit's products in order to maximize their sales. This functional approach to the OSE leaves no question that Plaintiffs' primary duty was making sales, making them subject to the OSE as a matter of law, and requiring dismissal of their overtime claims.

### E.    Any Promotional Work Performed Was in Support of Plaintiffs' Own Sales

Plaintiffs also appear to assert that the work they performed was mere non-exempt promotional or marketing work. (Dkt. 134-1 at 3, describing work as "marketing" and "promoting"). Outside sales employees' promotional work is exempt activity if it is "performed incidental to and in conjunction with an employee's own outside sale or solicitations." 29 C.F.R.

§ 541.503.[14] Here, the undisputed facts reveal that Plaintiffs' job was to make sales and that their ancillary tasks were performed in conjunction with their own sales. UF ¶¶44-45. Plaintiffs' principal duty was to sell products; Plaintiffs did not promote general sales within a store and were not responsible for promoting the sale of any items other the products in their show. UF ¶6.

To the extent Plaintiffs performed other tasks, such as attending conference calls about their sales, setting up or taking down displays, or keeping track of their own inventories, those tasks were "incidental to and in conjunction with [Plaintiffs'] own outside sales or solicitations," and therefore "exempt outside sales work." 29 C.F.R. § 541.500(b) (specifying that tasks such as "writing sales reports," "updating or revising the employee's sales or display catalogue" and "attending sales conferences" are exempt outside sales work). Plaintiffs participated in conference calls to discuss effective sales techniques and strategies for how to better sell products. UF ¶45. Plaintiffs managed their displays because they wanted to maximize the likelihood of customers buying products from them. To illustrate, Plaintiff Wolfert testified that he added a sign that said "Blowout sale" to his display in order to take advantage of customer impulsivity. UF ¶23. Plaintiffs tracked their inventories to ensure that they always had product to sell, so that they could maximize their sales and commissions. UF ¶44. After Plaintiffs set up displays, they spent most of their time standing near those displays, directly soliciting customers to purchase the products, and handing customers products for purchase. UF ¶¶9-10. Each of Plaintiffs' job duties, including the tasks discussed above, were "directed toward consummation of [their] own sales [and therefore] are exempt." 29 C.F.R. § 541.503(b). *See Karl v. Zimmer Biomet Holdings, Inc.*, No. C 18-04176 WHA, 2019 WL 5677543, at *3 (N.D. Cal. Oct. 31, 2019) (discussing exempt activities incidental

---

[14] Promotional work is non-exempt only if it is "incidental to sales made . . . by someone else." 29 C.F.R. § 541.503(a).

to sales). The incidental work that Plaintiffs did to prepare themselves to make sales and maximize their selling potential do not overcome their principal and primary duty, which was making sales.

## F. *Christopher* **Is Not Limited to Highly Regulated Industries**

Plaintiffs also appear to contend that the Supreme Court's guidance in *Christopher* is very narrow and applies only in the unique regulatory environment of pharmaceutical sales. (Dkt. 78 at 11). The crux of the Supreme Court's guidance was not limited to the niche industry but was manifested in the approach that the Court took to the exemption, *i.e.*, that a functional, industry specific approach is appropriate in determining whether a given employee's primary duty is making sales. *Christopher.* at 164 (the phrase "other disposition" in OSE "represent[s] an attempt to accommodate industry-by-industry variations in methods of selling commodities.")

The courts have rejected Plaintiffs' narrow reading of *Christopher*. In *Flood*, the Second Circuit rejected a similar contention that the analysis in *Christopher* was cabined to the regulatory environment and found that *Christopher*'s reasoning was generally applicable to other outside sales cases. *Flood*, 904 F.3d at 230-31 ("*Christopher* does not further suggest that its reasoning and interpretation of the statute and regulations lack general applicability to other cases arising under the FLSA [outside the pharmaceutical context]."). Trial courts have reached the same conclusion. The Northern District of Ohio has recognized that "while making a sale for the purposes of the FLSA does not necessarily require a transfer of title, *the alleged selling activity must be viewed in the context of the particular industry at issue*—including whether the industry is subject to a 'unique regulatory environment'—and the [fact finder] must determine whether within that particular industry, the employee has the job of making 'arrangements that are tantamount to a paradigmatic sale of a commodity.'" *Hurt v. Commerce Energy, Inc.*, 92 F. Supp. 3d 683 (N.D. Ohio 2015) (emphasis added); *see also Dooley v. CPR Restoration & Cleaning Servs., LLC*, 2013 WL 12085238, at *6 (E.D. Pa. Dec. 18, 2013) ("In the fire remediation industry,

salespeople make sales by being the first to speak with the property owner, not through the kinds of efforts that one might typically associate with a salesperson."). The consensus among federal courts across the country has been that *Christopher* prescribes a functional, industry-specific analysis to what constitutes "making sales" for purposes of the OSE, irrespective of whether the industry is constrained by onerous regulations.

**G.     In the Context of a Wholesale Club, Plaintiffs' Efforts Were "Making Sales"**

Applying a functional analysis, the work that Plaintiffs performed in wholesale clubs constitutes sales. The nature of Summit's business model renders it structurally impracticable for Brand Representatives to ring their own transactions. UF ¶8. In order to control inventory and maintain a generalized control over their store operations, the business partners that host Summit's Brand Representatives (e.g., Costco or Sam's Club) generally require that all transactions occur only at the store's established bank of cash registers. UF ¶8. The host stores typically will not allow Summit employees to operate the cash registers, nor is it practical for Summit to train them to do so. *Id.* As such, once a Summit Brand Representative has convinced a customer to take a product from his display with the stated intention of paying for it, the Brand Representative and Summit have done all that is possible for them to finalize the transaction. UF ¶¶8-9. In substance, every customer who approached a cash register at a wholesale club with Plaintiffs' goods in their cart had already been convinced to purchase the goods—the cashier did nothing more than merely process payments, without undertaking to engage in persuasive activity. UF ¶8. If Plaintiffs were not selling these Summit products, no one was.

**H.     Plaintiffs Were Customarily and Regularly Outside
Summit's Place of Business while Making Sales**

The second prong of the OSE requires an employee to be customarily and regularly engaged away from the employer's place of business. 29 C.F.R. §§ 541.502, 541.701. Plaintiffs

did not seriously contest this prong at the motion to dismiss stage (Dkt. 78 at 18: "Because Plaintiffs did not make sales to begin with, where they performed their tasks is irrelevant"), and the discovery record provides no basis to contest it here. Plaintiffs were engaged away from Defendant's place of business because they worked entirely outside of any location owned or operated by Summit. Plaintiffs worked at third-party retail establishments and frequently moved between stores.[15] Only Plaintiff Modeski testified that he set foot on premises owned or operated by Summit, and that was only on one or two occasions. UF ¶32. There is also no question that Plaintiffs' outside activities were customary and regular.[16] Thus, Plaintiffs customarily and regularly performed their sales work away from Summit's place of business.

## IV.    CONCLUSION

For the reasons discussed above, the undisputed facts show that Plaintiffs are exempt outside salespeople.  Accordingly, they cannot prevail on their claim for unpaid overtime under any of the causes of action alleged in the First Amended Complaint.   Therefore, Defendant respectfully requests that this Court grant summary judgment in Defendant's favor as to the claims of Plaintiffs Modeski, Ortiz, Wolfert, Zammito and Damboise.

---

[15] The itinerant nature of Plaintiffs' work leaves no room for argument as to whether they were employed inside any place of business maintained by Summit.  *See* DOL Opinion Letter FLSA2008–6NA (May 8, 2008) ("locations where the salesperson sells [ ] items are fixed sites, but would not be considered the employer's place of business . . ."); *Barth v. Champion Roofing, Inc.*, No. 11 C 2025, 2011 WL 2395555, at *1 (N.D. Ill. June 10, 2011) (rejecting argument by roofing salesman that employer's "places of business" included job sites); *Cangelosi v. Gabriel Bros.*, No. 15-CV-3736 JMF, 2015 WL 6107730, at *2 (S.D.N.Y. Oct. 15, 2015) (dismissing complaint of jewelry salesman who regularly sold jewelry at customers' places of business).

[16] Even engaging in sales activity outside the office only "one or two hours a day, one or two times a week" satisfies the second prong of the OSE. *See* DOL Wage Hour Op. Ltr. No. FLSA2007–2 (Jan. 25, 2007); *Taylor v. Waddell & Reed, Inc.*, No. 09CV2909 AJB WVG, 2012 WL 10669, at *4  (S.D. Cal. Jan. 3, 2012) (employee who "spent 'easily 30 or 40 percent' of his time in any given week on sales activity outside the office, . . . far surpasses the 'customarily and regularly' threshold"); *Lint v. Northwestern Mutual Life Ins. Co.*, 2010 WL 4809604 at *3  (S.D.Cal. Nov. 19, 2010) (10–20% of working time on outside sales is sufficient).

DATED: March 20, 2020

Respectfully submitted,

SUMMIT RETAIL SOLUTIONS, INC.

By Its Attorneys,

/s/ Michael E. Steinberg
Barry J. Miller (BBO# 661596)
  bmiller@seyfarth.com
Hillary Massey (BBO# 669600)
  hmassey@seyfarth.com
Michael E. Steinberg (BBO# 690997)
  msteinberg@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 300
Boston, MA  02210-2028
Telephone:   (617) 946-4800
Facsimile:   (617) 946-4801

## **CERTIFICATE OF SERVICE**

     I hereby certify that a copy of the foregoing document was filed through the Court's CM/ECF system, which will send notice of this filing to all counsel of record.

/s/Michael E. Steinberg
Michael E. Steinberg