# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**JOSEPH MODESKI, et al., on behalf of**          )
**themselves and all similarly situated**         )
**employees,**                                    )          **Civil Action No.**
                                        )          **18-12383-FDS**
      **Plaintiffs,**                        )
                                        )
      **v.**                                )
                                        )
**SUMMIT RETAIL SOLUTIONS, INC.,**                )
                                        )
      **Defendant.**                        )
_____)

## MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is a claim for overtime compensation.  The named plaintiffs were "Brand Representatives" who demonstrated products and provided free samples to customers at retail stores, including membership-only warehouse clubs such as Costco, BJ's, and Sam's Club.  They have brought suit against their employer, defendant Summit Retail Solutions, for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and analogous laws of Maryland, New Jersey, New York, Ohio, and Pennsylvania.

Section 207 of the FLSA requires employers to compensate all non-overtime exempt employees at least one and one-half times their regular wage for each hour worked in excess of 40 hours per work-week.  Only those who work in certain capacities, including "outside salesmen," are exempt from that requirement.  Plaintiffs contend that Summit improperly classified its Brand Representatives as exempt and thus denied them overtime compensation to which they were entitled.

The parties have filed cross-motions for summary judgment on a single issue:  whether plaintiffs are subject to the outside sales exemption ("OSE") in the FLSA, 29 U.S.C. § 213(a)(1). For the following reasons, the Court concludes that they are.  Accordingly, defendant's motion will be granted, and plaintiffs' motion will be denied.

## I.  Background

### A.  Factual Background

The following facts are set forth in the record and are undisputed except as noted.

Summit Retail Solutions, Inc. is a corporation that provides in-person marketing services. (*See* Pls. Mem., Ex. 3 ("Booth Dep.") at 25:21-26:3).  Those services consist of demonstrating products and interacting with customers at the stores of Summit's "clients."  (Pls. Mem., Ex. 1 at 5).  Those clients include membership-only warehouse clubs such as Costco, BJ's Wholesale Club, and Sam's Club, as well as department stores and grocery stores.  (*Id.*).  The Summit employees who perform the marketing services are referred to as "Brand Representatives."  (*See* Booth Dep. at 48:16-49:4; Def. Mem., Ex. 3; Def. Mem., Ex. 4).[1]

Each of the named plaintiffs—Nathan Damboise, Joseph Modeski, Rudy Ortiz, Jeffrey Wolfert, and Giovanni Zammito—worked for Summit as a Brand Representative sometime between 2014 and 2019.  (*See* Pls. Mem., Ex. 7 ("Damboise Dep.") at 11:9-12 (January 2017 to July 2017); Modeski Dep. at 113:11-14, 83:18-21 (November 2014 to February 2017); Def. Mem., Ex. 7 ("Ortiz Dep.") at 87:3-6 (approximately 2015 to 2019); Pls. Mem., Ex. 6 ("Zammito Dep.") at 18:21-19:2, 41:2-5, 42:10-13 (approximately March 2015 to September 2015)).[2]

---

[1] Summit also employs Senior Brand Representatives, who are Brand Representatives who have been promoted.  (*See, e.g.*, Pls. Mem., Ex. 5 ("Modeski Dep.") at 113:15-114:2).  The job responsibilities of Senior Brand Representatives appear to be substantially similar to those of Brand Representatives.  (*See id.*; Booth Dep. at 65:2-10).  Accordingly, the Court will refer to both positions collectively as Brand Representatives.

[2] The dates of Wolfert's employment with Summit are not entirely clear.  Plaintiffs allege that Wolfert was employed by Summit between approximately January 2016 and January 2018.  (Proposed Am. Compl. ¶ 15).

Brand Representatives perform their services at stores operated by Summit's clients. (*See* Pls. Mem., Ex. 1 at 5).  The named plaintiffs typically worked at Costco, BJ's Wholesale Club, or Sam's Club stores.  (*See, e.g.*, Modeski Dep. at 107:4-9; Damboise Dep. at 60:14-24; Zammito Dep. at 91:11-19).

At each store, Brand Representatives market a particular product at a designated display area.  (Zammito Dep. at 91:11-23).  They do so only for a limited period of time, typically four days.  (*See* Modeski Dep. at 250:13-18).  Summit employees refer to those arrangements— marketing a product at a certain store for several days—as "shows."  (*See, e.g.*, *id.*).

The products are typically a type of prepared food or a household item such as pillows. (Modeski Dep. at 122:2-21; Damboise Dep. at 63:24-64:6; Zammito Dep. at 57:5-14). Generally, the products have been purchased and are owned by Summit, rather than the operator of the retail store where the show takes place.  (Booth Dep. at 43:11-17).  They are not usually sold at the store and are only available near the display manned by the Brand Representatives. (*Id.* at 28:17-29:1; *see, e.g.*, Zammito Dep. at 91:11-23; Damboise Dep. at 71:22-72:3).[3]  At the end of each show, Summit typically ships away its unsold products, presumably to sell them elsewhere.  (*See* Booth Dep. at 43:11-17).

During shows, Brand Representatives market the products directly to customers.  They do so at the designated display area, where they demonstrate the product that is on sale and speak with customers.  (Modeski Dep. at 109:5-111:23; Zammito Dep. at 59:9-60:14; Damboise Dep. at 64:10-65:1).  Product demonstrations vary with the type of product.  Brand Representatives

---

Wolfert's deposition testimony seems to contradict that, as he did not dispute Summit's records showing that he was promoted in November 2013.  (Def. Mem., Ex. 8 ("Wolfert Dep.") at 106:4-15).  In any event, the exact dates of Wolfert's tenure at Summit do not appear to matter for present purposes.

[3] However, on some occasions, Summit's clients may display and sell a product when the Brand Representatives are not there.  (Damboise Dep. at 70:9-71:15; Modeski Dep. at 132:1-13).

typically display household items or model their use for customers; for food products, they offer free samples.  (Modeski Dep. at 212:19-213:1; *see, e.g.*, Damboise Dep. at 64:10-65:1; Zammito Dep. at 59:13-18).  They also speak to customers to try to convince them to buy the product. (Modeski Dep. at 109:11-21; Zammito Dep. at 59:13-18; Damboise Dep. at 64:10-65:1).  When doing so, they sometimes use selling techniques to try to persuade customers, such as representing that it is the last day of a show in order to convey urgency to customers.  (*See, e.g.*, Wolfert Dep. at 194:16-196:16).  Some of those techniques have been taught to them by Summit, such as "assuming the sale" by placing the product in a customer's shopping cart.  (Zammito Dep. at 99:1-24; *see, e.g.*, Damboise Dep. at 64:21-65:4).

However, customers cannot purchase the products directly from Brand Representatives. (Booth Dep. at 41:14-19).  Instead, they have to do so at the store's cash registers.  (Booth Dep. at 41:14-19, 87:7-10).  Those cash registers are operated by the employees of Summit's clients. (Def. Mem., Ex. 10 ("Booth Decl.") ¶ 5; Pls. Mem., Ex. 8 ("Stipulations") ¶ 4).  This is not due to any legal or regulatory restrictions on Summit's business.  (Stipulations ¶ 2).  Rather, it is a restriction imposed by Summit's clients "[i]n order to control inventory and maintain a generalized control over their store operations."  (Booth Decl. ¶ 5).

Even if a Brand Representative convinces a customer to take a product, that does not necessarily mean the customer will buy it.  Sometimes, customers take a product out of their cart before reaching the cash register.  (*See, e.g.*, Damboise Dep. at 161:7-13; Modeski Dep. at 129:22-130:3).  A customer may also buy a product even if it has not been directly pitched to them by a Brand Representative; for example, occasionally customers simply take a product from the display.  (*See, e.g.*, Damboise Dep. at 160:5-11; Modeski Dep. at 252:21-253:7; Zammito Dep. at 161:20-162:8).

Brand Representatives also perform a variety of tasks in support of their shows.  They set up and dismantle their product displays.  (Def. Mem., Ex. 3; Def. Mem., Ex. 4; Pls. Mem., Ex. 1 at 14).  They stock them with products and restock them as needed.  (Def. Mem., Ex. 3; Def. Mem., Ex. 4; Booth Dep. at 78:16-24).  Occasionally, they transport the products from one store to another.  (*See, e.g.*, Modeski Dep. at 245:1-23).  They manage their inventory of products, which involves tracking the number of products delivered, counting the number sold, and submitting reports to their managers.  (Booth Dep. at 73:7-75:7).  Managing the inventory also sometimes requires tracking down stray products that customers have left in a client's store outside the display area.  (*See, e.g.*, Damboise Dep. at 161:7-17).  Finally, they participate in conference calls to discuss sales performance or to share sales techniques.  (Booth Dep. at 75:8-77:11).

Brand Representatives are compensated in two forms:  a base hourly wage and commissions.  (Pls. Mem., Ex. 9 at 7-9).  They are typically paid between $10 and $15 per hour.  (*See, e.g.*, Damboise Dep. at 49:4-7; Zammito Dep. at 52:1-5; Modeski Dep. at 119:16-22).  They are also eligible for commissions if they reach certain sales goals.  (Pls. Mem., Ex. 9 at 7-9).  Summit determines their commission eligibility approximately every four weeks by taking a certain percentage of the sales made at a client's register for products they had marketed, known as a "calculated commission," and comparing that to their hourly wages.  (*Id.*; Booth Dep. at 100:1-6).  If Brand Representatives' calculated commission exceeds their hourly wages, then they are entitled to a "true-up" payment to make up the difference.  (Pls. Mem., Ex. 9 at 7-9; Booth Dep. at 99:13-21).  If their calculated commission is less than their hourly wages, they do not receive any true-up payment and the difference is subtracted from their calculated commission for the next period.  (Pls. Mem., Ex. 9 at 7-9).

The parties dispute the importance of these commissions to Brand Representatives. Plaintiffs contend that they received "minimal" true-up payments, while Summit contends that it paid them regularly.  (*Compare* Pls. Mem. at 8 *with* Def. Mem. at 6-7).  It does seem that Brand Representatives receive true-up payments with some frequency.  Nearly all of the plaintiffs at issue here testified that they received true-up payments in at least 40% of the months they had worked for Summit.  (Ortiz Dep. at 116:19-24 (6 out of 14 months); Zammito Dep. at 129:2-20 (about half of the time); Modeski Dep. at 140:5-11 (more than half of the time); Damboise Dep. at 94:9-21 (every month); *see also* Wolfert Dep. at 128:20-137:6 (acknowledging receiving multiple true-up payments)).  Yet is also true that in some cases, those commissions made up a relatively small share of their total compensation.  For example, it seems that in 2015, Zammito's commissions accounted for approximately 4% of his compensation from Summit.  (*See* Pls. Mem., Ex. 10 at 1).  And in 2017, Damboise's commissions accounted for approximately 16% of his compensation from Summit.  (*Id.* at 2).

Generally, Summit sets the schedules worked by Brand Representatives, although those schedules can vary depending on their assignment or manager.  (*See* Booth Dep. at 118:10-24). Summit requires Brand Representatives to record their hours and report them to their managers. (*Id.* at 120:2-121:21).  It also chooses the client locations where Brand Representatives work each week.  (*See* Zammito Dep. at 58:2-59:1; Booth Dep. at 126:20-127:7).  However, Summit does not typically supervise Brand Representatives as they work a show once they are at those locations.  (Modeski Dep. at 233:23-235:2; Zammito Dep. at 139:14-142:1).

## B.  <u>Procedural Background</u>

The complaint in this case was originally filed in the District of Maryland.  On November 13, 2018, the parties agreed to transfer the case to this district.  An amended complaint was filed on May 15, 2020.

The amended complaint asserts seven claims against Summit.  Count 1 asserts a claim for violation of the FLSA for failure to pay overtime wages.  (Am. Compl. ¶¶ 127-132).  Count 2 asserts an analogous claim under the Maryland Wage and Hour Law.  (*Id.* ¶¶ 133-39).  Count 3 asserts an analogous claim under the New York Labor Laws.  (*Id.* ¶¶ 140-46).  Count 4 asserts an analogous claim under the Pennsylvania Minimum Wage Act.  (*Id.* ¶¶ 147-152).  Count 5 asserts a claim under the Maryland Wage Payment Collection Law for failure to pay wages owed.  (*Id.* ¶¶ 153-57).  Count 6 asserts a claim under the New Jersey Wage and Hour Law.  (*Id.* ¶¶ 158-163).  Count 7 asserts a claim under the Ohio Minimum Fair Wage Standards Act.  (*Id.* ¶¶ 164-69).  It is undisputed that liability for Counts 2 through 7 is predicated on a violation of the FLSA.  (*See* Def. Mem. at 8 n.9; *see generally* Pl. Opp.).

On December 13, 2018, plaintiffs moved for conditional certification of an FLSA collective action, which the Court granted on May 15, 2019.

On January 18, 2019, defendant moved to dismiss the complaint for failure to state a claim, contending that the OSE applies, and therefore plaintiffs are not subject to the FLSA's overtime-pay requirements.  On April 23, 2019, the Court denied that motion, finding that the development of a factual record was necessary to determine whether the exemption applied.  *See generally Modeski v. Summit Retail Sols., Inc.*, 2019 WL 1778518 (D. Mass. Apr. 23, 2019).

The parties have now cross-moved for summary judgment on that issue.

## II.   <u>Legal Standard</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine

issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.   Analysis

### A.   Statutory and Regulatory Framework of the Outside Sales Exemption

Section 207(a) of the FLSA requires employers to pay qualified employees overtime wages.  *See* 29 U.S.C. § 207(a).  However, Section 213(a), entitled "Minimum Wage and Maximum Hour Requirements," specifies that an employee working "in the capacity of outside salesman" is not subject to that provision.  *Id.* § 213(a)(1).  Congress did not define "outside salesman," delegating that responsibility to the Department of Labor ("DOL").  *See id.*

The DOL has defined "outside salesman" to mean an employee "(1) whose primary duty is (i) making sales within the meaning of [29 U.S.C. § 203(k)], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500.  Section 203(k) in turn defines "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).

However, the DOL has also drawn a distinction between an outside salesperson (who is exempt from the FLSA overtime wage requirement) and an individual who performs "promotional work" (who is not).  The DOL regulation states as follows:

> Promotion[al] work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work . . . .  Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work.  On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.

29 C.F.R. § 541.503(a).  As an example, the DOL regulation states that "[p]romotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work."  *Id.* § 541.503(b).  Similarly, where the employee "does not consummate the sale" or make "direct efforts toward the consummation of a sale, the work is not exempt outside sales work."  *Id.* § 541.503(c).

### B.       Whether the Outside Sales Exemption Applies

Defendant contends that plaintiffs were subject to the OSE, and therefore not entitled to overtime pay as required by the FLSA.  Whether that is true turns on two questions; in order for the OSE to apply, both must be answered affirmatively.  The first issue (and the basis of the principal dispute) is whether plaintiffs' primary responsibility was "making sales" within the meaning of 29 U.S.C. § 203(k).[4]  The second is whether plaintiffs were "customarily and regularly engaged away from the employer's place or places of business" in performing that duty.  *Id.* § 541.500(a)(2).

 "How an employee spends his or her time at work is a question of fact, but whether the particular activities subject the employee to an exemption from the FLSA requirements is a

---

[4] The parties agree that plaintiffs were not "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer."  29 C.F.R. § 541.500(a)(1)(ii).

question of law." *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 27 (D. Mass. 2015).  Here, there are no genuine disputes of material fact as to how plaintiffs spent their time while employed by defendant.  The parties offer competing characterizations of the record, but the underlying material facts are not genuinely in dispute.  Thus, the question of whether the OSE applies may be resolved as a matter of law.

Plaintiffs suggest that because they were classified as non-exempt and paid overtime by defendant, the OSE cannot apply.  (*See* Pls. Mem. at 2).  However, the OSE does not require that an employer satisfy certain salary requirements in order for the exemption to apply.  29 C.F.R. § 541.500(c).  Several courts have accordingly held that "while the label of 'nonexempt' may be evidence that a position is not exempt, such a label is not dispositive."  *Burke v. Alta Colleges, Inc.*, 2015 WL 1399675, at *44 (D. Colo. Mar. 23, 2015) (internal quotations omitted); *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756-57 (W.D. Mich. 2003); *Fields v. AOL Time Warner*, 261 F. Supp. 2d 971, 975 (W.D. Tenn. 2003).  "Instead the actual job duties and actions performed by the employee[s] are dispositive."  *Fields*, 261 F. Supp. 2d at 975.  Thus, although plaintiffs were previously classified as non-exempt, the OSE may still apply.  *See, e.g.*, *Burke*, 2015 WL 1399675, at *44.

### 1.  Whether Plaintiffs' Primary Responsibility Was Making Sales

The first question is whether plaintiffs' "primary duty [was] making sales within the meaning of [29 U.S.C. § 203(k)]." 29 C.F.R. § 541.500.  The starting point in that analysis is the Supreme Court's opinion in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012).

In *Christopher*, the plaintiffs were pharmaceutical sales representatives, or "detailers," responsible for "calling on physicians in an assigned sales territory to discuss the features, benefits, and risks of an assigned portfolio of [the employer's] prescription drugs." *Id.* at 151. The plaintiffs' "primary objective was to obtain a nonbinding commitment from the physician to

prescribe those drugs in appropriate cases." *Id.* (footnote omitted).  The district court granted

summary judgment to the defendant, finding that the OSE applied.  *Id.* at 152.  On appeal, the

plaintiffs "contend[ed] that the District Court had erred in failing to accord controlling deference

to [the DOL's] interpretation of the pertinent regulations" under *Auer v. Robbins*, 519 U.S. 452

(1997).  *Id.*   Specifically, the DOL had argued that "pharmaceutical detailers are not exempt

outside salesmen."  *Id.* at 153.

  The Supreme Court held that the pharmaceutical sales representatives were in fact outside

salesmen exempt from the FLSA's overtime wage requirement.  It stated that the DOL's

interpretation was "neither entitled to *Auer* deference nor persuasive in its own right."  *Id.* at 161.

Analyzing the text of the FLSA and applicable regulations, the court first noted the statutory

definition of "sale" in Section 203(k) was "introduced with the verb 'includes' instead of

'means,'" suggesting that the definition was "not exhaustive."  *Id.* at 162.  Second, it noted that

the "list of transactions included in [Section 203(k)] is modified by the word 'any,'" which "is

best read to mean 'one or some indiscriminately of whatever kind.'"  *Id.* (quoting *United States

v. Gonzales*, 520 U.S. 1, 5 (1997)).  Third, it noted that Section 203(k) included a "broad catchall

phrase: 'other disposition.'"  *Id.* at 163.  Taking those factors together, the court reasoned that

Congress intended to define "sales" broadly "to accommodate industry-by-industry variations in

methods of selling commodities."  *Id.* at 164.  Even though the plaintiffs were tasked with

obtaining only "a nonbinding commitment from a physician to prescribe [the defendant's]

drugs," that type of arrangement was common in the pharmaceutical industry, which had its own

"unique regulatory environment."  *Id.* at 165.  The court added that the sales representatives bore

the "external indicia" of salesmen—namely, that they (1) were hired for their sales experience,

(2) were trained to close sales calls by "obtaining the maximum commitment possible" from

physicians, (3) worked away from the office with minimal supervision, and (4) were compensated at least in part through commissions. *Id.* at 165-66. Accordingly, the court concluded that the plaintiffs' primary responsibility was making sales, and therefore they were subject to the OSE.

The court rejected the plaintiffs' argument that pharmaceutical sales representatives were "nonexempt promotional employees who merely stimulate sales made by others." *Id.* at 167. The plaintiffs had argued that because they only obtained nonbinding commitments and that other employees received the final drug orders, they were not salespeople. *Id.* The court rejected that as a "formalistic argument . . . inconsistent with the realistic approach that the [OSE] is meant to reflect." *Id.* And the court later reinforced that notion when it concluded that exemptions to the FLSA, including the OSE, should not be construed narrowly. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

Since *Christopher*, at least three federal appellate courts have considered the scope of the applicability of the OSE. Although each case turned on its own factual pattern, the cases together provide guideposts for the resolution of this matter.

In *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 577-78 (6th Cir. 2014), the plaintiffs were "sales representatives" of KeHE, a distributor of specialty ethnic and health foods. However, four "layers of personnel" managed KeHE's client relationships. *Id.* at 577-78. KeHE's customer development team initiated a relationship with a client, the business development team "negotiate[d] the broad parameters of any overarching distribution contract," and the account managers helped determine which products would be sold and developed marketing "plan-o-gram[s]" for clients. *Id.* "[S]ales representative[s] [were] the on-the-ground contact for each individual store." *Id.* Despite the job title, however, the sales representatives'

day-to-day responsibilities entailed few actual sales—they would meet delivery trucks several times per week, "oversee the unloading of products," help stock products, and "place orders for more products based on depleted inventory." *Id.* They were paid "entirely on commission" through a "byzantine" formula. *Id.*

The Sixth Circuit held that the KeHE sales representatives were not outside salesmen. It first determined that *Christopher* was of "limited import" because KeHE was not engaged in an industry that had a "unique regulatory environment," such as pharmaceuticals. *Id.* at 584. Next, it noted that the evidence (viewed in the light most favorable to the plaintiffs) showed that a jury could reasonably conclude that the "sales representatives" did not make sales. *Id.* Indeed, even if the act of placing orders to replenish stocks could be considered "sales," the "vast majority of [their] time [was] spent stocking and cleaning shelves." *Id.* at 585. The sales representatives' commissions were also tied to stocking shelves. *Id.* And KeHE's "own internal documents" showed that account managers were the true salespersons within the company, not the sales representatives. *Id.* at 586.

The Eighth Circuit reached a similar conclusion in *Beauford v. ActionLink, LLC*, 781 F.3d 396 (8th Cir. 2015). In that case, the plaintiffs were "Brand Advocates" for ActionLink, a marketing services provider. *Id.* at 399. Brand Advocates were tasked with "visit[ing] retail stores, train[ing] the retail stores' employees on how [ActionLink's client's] electronics worked, and convinc[ing] those employees to recommend [the client's] products to customers." *Id.* Brand Advocates were provided scripts, PowerPoint presentations, and other promotional materials to use for their assigned geographical areas, which encompassed approximately 20 stores apiece per week. *Id.* However, Brand Advocates "did not sell directly to customers or to retail stores." *Id.*

The Eighth Circuit, like the Sixth Circuit in *Killion*, reasoned that *Christopher* was of limited import because "the world of consumer electronics is not subject to a 'unique regulatory environment' that requires a recommendation from a licensed professional to obtain a product." *Id.* at 403.  The court concluded that Brand Advocates were primarily engaged in "promotional activities designed to stimulate sales that will be made by someone [else]"—namely, the retail store's own employees.  *Id.* (alterations, internal quotation marks, and citation omitted). Accordingly, the court held that the primary responsibility of the Brand Advocates was not making sales and that the OSE did not apply.

More recently, however, the Second Circuit reached a different result in *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2d Cir. 2018).  In *Flood*, the plaintiffs "were employed to engage in door-to-door solicitation to persuade customers to buy their electricity or natural gas from Just Energy." *Id.* at 223.  "When engaged in door-to-door solicitation efforts, [plaintiffs] wore a company badge and followed a company script." *Id.* at 224.  The plaintiffs were compensated entirely through commissions.  *Id.* at 225-26.

The Second Circuit found that the principles of *Christopher* were applicable, despite the differences between the pharmaceutical and utility industries.  *Id.* at 230-31.  It reasoned that *Christopher* instructed lower courts to adopt "a functional, rather than a formal, inquiry."  *Id.* at 231 (quoting *Christopher*, 567 U.S. at 161 (internal quotation marks omitted)).  Moreover, it noted that "[t]he touchstone for making a sale, under the Federal Regulations, is obtaining a commitment."  *Id.* (quoting *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008)) (internal quotation marks omitted).  Because the plaintiffs obtained such commitments from customers to purchase their energy needs from Flood, the court held that they were quintessential salesmen.  *Id.*

This case falls somewhere in between *Killion*, *Beauford*, and *Flood*.  What separates it from *Killion* or *Beauford* is that plaintiffs here routinely marketed products directly to customers, attempting to convince them to make a purchase.  Indeed, that was their primary responsibility: "to convince somebody to buy a product, to pay for it that day, and walk out of the store with it." (Modeski Dep. at 112:12-17; *see also* Ortiz Dep. at 144:18-145:11; Zammito Dep. at 59:9-60:14).  While the plaintiffs in both *Killion* and *Beauford* worked in retail stores, their primary duty did not involve speaking directly to customers to convince them to buy a product.  In *Killion*, "the vast majority of the plaintiffs' time [was] spent stocking and cleaning shelves."  761 F.3d at 585.  In *Beauford*, the plaintiffs sometimes "spoke with customers who had questions about [LG] products," but their main duties were "to visit retail stores, to train the retail stores' employees on how LG electronics worked, and to convince those employees to recommend LG products to customers."  *See* 781 F.3d at 399; *see also id.* ("Despite their other tasks, brand advocates did not sell directly to customers or to retail stores.").

Plaintiffs nonetheless contend that their primary duty was to "accomplish brand awareness," which meant stimulating future sales generally, not persuading customers to buy a specific product that day.  (Pls. Mem. at 18-20).  In support, they cite to their job descriptions and defendant's descriptions of its business on its website.  (*Id.* (citing Pls. Mem., Ex. 2; Pls. Mem., Ex. 4)).  But what matters is how they actually spent their time on the job, not formal or aspirational descriptions of their duties.  *See Cash v. Cycle Craft Co.*, 508 F.3d 680, 685 (1st Cir. 2007).  And the record is overwhelmingly clear that their primary duty was "to get the customer to put the [product] in their cart and buy it at the front of the store."  (Damboise Dep. at 79:18-22; *see also* Booth Dep. at 50:1-8; Modeski Dep. at 112:12-17; Ortiz Dep. at 144:18-145:11; Zammito Dep. at 59:9-60:14).

Plaintiffs further contend that they performed promotional work that was only "incidental to" sales that were made by someone else—the cashiers.  (Pls. Mem. at 18-20).  *See* 29 C.F.R. § 541.503(a) ("[P]romotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.").  Again, however, the plaintiffs' primary duty was to interact with customers and persuade them to take specific products to the front of the store for purchase. (Damboise Dep. at 79:18-22; Booth Dep. at 41:14-19, 87:7-10).  The cashiers rang up the sale, but otherwise engaged in no sales activity of any kind.  There is no evidence that any cashier ever attempted to persuade a customer to buy the product, and indeed it would have been odd for them to do so at the point of check-out.  (*See* Booth Decl. ¶ 7 (asserting that "cashiers merely process payments and are not in a position to convince a customer to buy additional products")).

If plaintiffs had accepted payment for the products, in addition to their other duties, there is little doubt that they would have been making sales.  *See Beauford*, 781 F.3d at 403 (observing that in the retail industry, a "paradigmatic sale" occurs when an employee "convince[s] customers to choose a product *and* help[s] that customer pay for it at a cash register") (emphasis added); *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1309-1310 (11th Cir. 2009) (holding title insurance agent made sales when she interacted with customers and "obtained the orders herself").  The question is whether a different result is required when plaintiffs did not actually complete the sales process themselves.

To begin, the mere fact that the cashiers accepted payment does not mean the plaintiffs were not engaged in sales.  *See Christopher*, 567 U.S. at 167 (rejecting a similar argument as "formalistic" and "inconsistent" with the OSE's "realistic approach"); *Killion*, 761 F.3d at 584 ("The fact that [employees] hit the order buttons on their electronic devices . . . is not enough to magically transform their jobs . . . to 'sales'").  Indeed, the DOL has recently advised that

16

employees who, like Brand Representatives, "display and demonstrate [their] employer's products" inside wholesale clubs may fall under the OSE even if it is the clubs' cashiers who ultimately accept payment for those products. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2020-8, (June 25, 2020) at 3-4. Instead, the focus of the inquiry is on the degree of customer commitment obtained by the plaintiffs, within the context of the relevant industry. *Id.*

Here, the customers of plaintiffs made only a tentative commitment to buy the product at the register by putting it in their shopping cart. (*See* Modeski Dep. at 216:18–217:3 (testifying that once customers took a product, it was as close to sold as it could be, "short of walking them to the register")). But that commitment was not binding; indeed, customers sometimes took a product out of their cart before reaching the register. (*See, e.g.*, Damboise Dep. at 161:7-13; Modeski Dep. at 129:22-130:3).

Nonetheless, a binding commitment is not always necessary to make a sale within the meaning of 29 U.S.C. § 203(k). *See Flood*, 904 F.3d at 233 (stating that "the [OSE] does not require that the employee have the ultimate authority to bind the customer or close the deal"); *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 441 (S.D.N.Y. 2017). Under *Christopher*, the Court is required to perform a practical, industry-specific analysis. *See* 567 U.S. at 164. Obtaining a "nonbinding commitment" may still qualify as a sale if it is "the most that [employees] were able to do to ensure the eventual disposition of the products that [their] employer] sells." *Id.* at 165. Because the "unique regulatory environment" prevented the plaintiffs in *Christopher* from obtaining more than "nonbinding commitments to prescribe drugs," that suffced to constitute a sale under 29 U.S.C. § 203(k). *Id.* Similarly, in *Flood*, the plaintiff had "received a commitment to buy" electricity but was unable to "conclusively close

the deal" because his employer "might occasionally decline to go through with a transaction (for example, if it turns out that the customer changes her mind or . . . is not creditworthy)."  904 F.3d at 229, 231.  The court, citing *Christopher* and DOL regulations, held that within the context of the utilities industry, this "commitment [] suffice[d] to constitute the making of a sale."  *Id.*; *see also Clements*, 530 F.3d at 1227 ("The touchstone for making a sale . . . is obtaining a commitment.").  By contrast, in *Beauford*, no such constraints prevented the plaintiffs from selling electronic products directly to customers.  781 F.3d at 403.  Accordingly, the court there held that they had not made sales by promoting those products to retail employees, who would in turn sell them to customers.  *Id.*

What suffices to constitute the making of a sale in this particular employment context appears to be an open question.  However, in a recent opinion letter, the DOL discussed whether the OSE applies to employees whose jobs closely resemble those of the Brand Representatives.  *See* Opinion Letter FLSA2020-8 at 4.  That letter discussed employees who, like plaintiffs here, "set up displays and perform demonstrations at various retail locations not owned, operated, or controlled by their employer to sell the employer's products."  *Id.* at 1.  And, like plaintiffs, some employees worked at wholesale clubs, and did not actually complete any sales themselves.  *Id.* The DOL concluded that whether such employees fall under the OSE depends on "whether or how [they] obtain[ed] a commitment from the customer to buy [their] employer's products."  *Id.*at 4.[5]  But it was unable to answer that question based on the facts provided to it.  *Id.*

Thus, the Court must determine what is "tantamount" to a "paradigmatic sale" in the "particular industry" at issue here.  *See* 567 U.S. at 164.  The parties dispute what is the relevant

---

[5] The DOL concluded that employees would also have to "be credited with the sale" in order for the OSE to apply.  Opinion Letter FLSA2020-8 at 4.  Here, it is undisputed that plaintiffs were credited with the sales consummated because of their efforts.  (*See* Pls. Mem., Ex. 9 at 7-9; Booth Dep. at 99:13-21).

industry.  Plaintiffs contend that it is the retail industry broadly, where a sale typically requires the acceptance of payment.  (Pls. Mem. at 14).  *See Beauford*, 781 F.3d at 403.  Defendant takes a narrower view; it contends that the appropriate context is that of single-product road shows inside wholesale clubs.  (Def. Mem. at 19).

It is true that Brand Representatives physically stand inside retail stores while they market products to customers.  But, as defendant points out, they cannot accept payment for those products for reasons that are specific to its business model—specifically, because its clients require all transactions to occur at their cash registers "[i]n order to control inventory and maintain a generalized control over their store operations."  (Booth Decl. ¶ 5).  Certainly, if Brand Representatives completed the sales process at their product display locations, one could imagine that it would be difficult for the cashiers to know which products in a customer's cart had been paid for, creating extra work and increasing the risk of theft or accidental loss.  (*See id.*).  It might also confuse customers if they were only able to buy certain products at certain points in the store, and therefore had to pay for the items in their cart at two different locations.[6] Under these circumstances, "obtaining a nonbinding commitment" from customers to take a product and pay for it at the register was "the most that [plaintiffs] were able to do to ensure the eventual disposition of the products that [defendant] sells."  *See Christopher*, 576 U.S. at 165.

Plaintiffs point out that the barriers preventing them from obtaining a binding commitment to buy were practical ones imposed by a particular business model, rather than legal or regulatory.  They contend that fact distinguishes this case from *Christopher*, which they say

---

[6] It is also not practical, for a variety of reasons, for Brand Representatives to persuade customers to take a product and then personally ring up the sale at the store's cash registers.  (*See* Booth Decl. ¶ 6).  That would require, among other things, that Brand Representatives leave their stations and go to the front of the store every time they made a sale.  It would also require that they operate the cash registers of the client store.  Presumably, too, the customer would expect that the Brand Representative would ring up the entire contents of his or her cart, as would any customers who formed a line behind that customer.

was limited to industries where a "unique regulatory environment" prevents employees from securing fully binding commitments by customers.  (Pls. Mem. at 16 (quoting *Christopher*, 576 U.S. at 165)).

There is some support in the caselaw for that position.  At least one district court has concluded that "[t]he distinguishing characteristic in *Christopher* was that the pharmaceutical representatives were *legally* prohibited from actually selling drugs to patients."  *Hurt v. Commerce Energy, Inc.,* 92 F. Supp. 3d 683, 697 (N.D. Ohio 2015) (emphasis added).  And in *Killion*, the court "distinguished *Christopher* on just this issue, finding that *Christopher* is not necessarily controlling outside of a situation where obtaining only a 'nonbinding commitment' is the result of a 'unique regulatory environment.'"  *Id.* (citing *Killion*, 761 F.3d at 583-84).[7]

However, *Christopher* should not be read so narrowly.  In plaintiffs' view, *Christopher* should "be confined to the peculiarities of the pharmaceutical sales market" and any other markets with similarly complex regulatory schemes.  *See Flood*, 904 F.3d at 230.  The Second Circuit rejected that same argument in *Flood*, observing that nothing in *Christopher* "suggest[s] that its reasoning and interpretation of the statute and regulations lack general applicability to other cases arising under the FLSA."  *Id.* at 231.  Indeed, the Supreme Court described the analysis of what constitutes a sale under 29 U.S.C. § 203(k) as a practical study in the "industry-by-industry variations in *methods of selling commodities*"—not in regulatory environments.  *See* 576 U.S. at 164 (emphasis added).  It held that the "unique regulatory" constraints of the pharmaceutical industry were sufficient to excuse the lack of a binding commitment.  *Id.* at 165

---

[7] Notably, both of those courts were construing the reach of *Christopher*, and thus of the OSE, before the Supreme Court's recent pronouncement that exemptions to the FLSA, including the OSE, should not be construed narrowly.  *See Encino Motorcars, LLC*, 138 S. Ct. at 1142.

& 165 n.23.  But it did not say that constraints necessarily had to be of that type.  *See id.*[8]

Moreover, "[t]he Supreme Court in *Christopher* [] cautioned against the use of technicalities to defeat the application of the [OSE]."  *Flood*, 904 F.3d at 230.  It observed that "the DOL has made it clear that exempt status should not depend on technicalities, such as whether it is the sales employee or the customer who types the order into a computer system and hits the return button, or whether the order is filled by a jobber rather than directly by the employee's own employer."  *Christopher*, 567 U.S. at 149 (internal quotations, alterations, and citations omitted).  And it noted that the DOL has "stressed" that the requirement that an employee make a sale "is met whenever an employee "*in some sense* make[s] a sale."  *Id.* (emphasis added).  That language further suggests that *Christopher* should be read to require a review of any industry-specific constraints, not merely constraints of a legal nature.  Therefore, under these circumstances, plaintiffs were making sales under 29 U.S.C. § 203(k) when they persuaded customers to take a product and obtained a nonbinding commitment from the customer to pay for that product at the cash register.

It is true that the customers here occasionally bought products without interacting with plaintiffs.  For example, Damboise testified that "sometimes," customers would "come back and grab" a product without speaking to him at all.  (Damboise Dep. at 160:5-11).  Similarly, Modeski testified that a "little chunk of [his] sales" came "from people walking by and grabbing something off the table when [he was not] physically there."  (Modeski Dep. at 252:13-20; *see*

---

[8] The Supreme Court suggested briefly, and in a footnote, that the issue was that the "entire industry [was] constrained by law or regulation from selling its products in the ordinary manner."  576 U.S. at 165 n.23.  But that footnote seems to be addressed to a concern, raised by the dissent, that employees would fall under the OSE simply because they did "the most they are able to do" to sell a product.  *See id.* at 177 (Breyer, J., dissenting) (citing a marketing employee who posts an advertisement as an example).  Thus, the majority appeared to be clarifying that in order for nonbinding commitments to qualify as sales, there had to be some industry-wide constraints preventing employees from doing more to secure binding commitments, not that those constraints necessarily had to be legal or regulatory ones.  *See* 576 U.S. at 165 n.23.

*also* Zammito Dep. at 162:5-8 (recalling that "sometimes [he] would come back from a lunch break, and [he] would see that people actually picked up [products]" in his absence")). But those incidents seem to have been relatively rare exceptions, rather than the norm. They happened only "sometimes" (Damboise Dep. at 160:5-11; Zammito Dep. at 162:5-8), or on "particular occasions," (Modeski Dep. at 252:21-253:7). (*See also* Modeski Dep. at 252:13-20 (testifying that such incidents made up a "little chunk of [his] sales")).[9] Thus, even if in those limited instances plaintiffs' promotional efforts were only stimulating sales generally, their primary duty was still making the sales themselves.

Finally, some courts have also looked to "external indicia" for guidance in determining whether an employee was exempt under the OSE. *See Christopher*, 567 U.S. at 165. The Supreme Court identified several such indicia in *Christopher*, noting that employees are more likely to have a primary duty of making sales if they are "hired for their sales experience"; "trained to close each sales call by obtaining the maximum commitment possible"; put to work "away from the office"; and "rewarded for their efforts with incentive compensation." *Id.*[10] It is unclear whether those indicia are formally part of the test for exemption under the OSE. *Flood*, 904 F.3d at 233-34 (observing that "the regulations that define 'making sales' do not include any reference" to many of the indicia set forth in *Christopher*); *Vasto v. Credico (USA) LLC*, 767 F. App'x 54, 57 (2d Cir. 2019) (describing the indicia as "arguably dicta in *Christopher*").

---

[9] Similarly, it appears that while the wholesale clubs occasionally sold the products marketed by plaintiffs when they were not present, this was also atypical and may have violated the agreed-upon arrangement. (*See* (Damboise Dep. at 69:22-70:2 (testifying that the stores "sometimes" put products out after he left, even though "[t]hey weren't supposed to . . . technically"); *see also* Modeski Dep. at 132:1-13 (testifying that "sometimes" products "stayed out after [Brand Representatives] left the store").

[10] Plaintiffs cite a slightly different set of indicia set forth by a district court. (Pls. Mem. at 21). *See Torrenegra v. Grameen Am., Inc.*, 2017 WL 1404291, at *1 (E.D.N.Y. April 19, 2017). However, because those factors appear "more numerous and expansive" than the ones set forth by the Supreme Court, the Court will confine its analysis to the indicia set forth in *Christopher. Cf. Flood*, 904 F.3d at 233 n.8.

Nevertheless, several courts have looked to them, at least as a secondary level of analysis.  *See, e.g.*, *Flood*, 904 F.3d at 233-34; *Beauford*, 781 F.3d at 403; *Hurt*, 92 F. Supp. 3d at 689-692.[11]

To the extent those indicia are relevant, they firmly support the conclusion that plaintiffs' primary duty was making sales.  Nearly all of plaintiffs previously worked in sales before they were hired by defendant.  (*See, e.g.*, Wolfert Dep. at 85:3-6 ("I have been in sales my whole life"); Damboise Dep. at 43:12-46:4 (recounting three prior jobs in sales); Ortiz Dep. at 76:12-18 (testifying that he had not previously had a "sales-oriented job" but had his own business selling cell phones)).  *But see* Modeski Dep. at 115:8-9 ("I had no previous sales experience").  They were trained by defendant in persuasive selling techniques, such as "assuming the sale" by placing a product in a customer's shopping cart.  (Zammito Dep. at 99:1-24; *see, e.g.*, Damboise Dep. at 64:21-65:4).  They received incentive compensation in the form of "true-up" payments.  (Pls. Mem., Ex. 9 at 7-9; Booth Dep. at 99:13-21).[12]  They worked on the premises of defendant's clients, rather than in an office.  And while their schedules were set by their supervisors, they were typically left to work each show unsupervised.  (*See, e.g.*, Modeski Dep. at 233:23-235:2; Zammito Dep. at 139:14-142:1).

In summary, plaintiffs' primary duty was making sales within the meaning of 29 U.S.C. § 203(k) because they marketed products directly to customers and obtained the maximum commitment to buy that was possible under the constraints of the relevant industry.  And to the

---

[11] Notably, many or all of those decisions predate the Supreme Court's recent statement that exemptions to the FLSA, including the OSE, should not be construed narrowly.  *See, e.g.*, *Vasto*, 767 Fed. App'x at 57 (noting that the Second Circuit has "not decided whether the indicia mentioned in *Christopher* are relevant to the outside sales exemption following the Supreme Court's decision in [*Encino Motorcars*, 138 S. Ct. 1134]").

[12] Plaintiffs contend that those payments were relatively small, sometimes accounting for as little as 4% of a Brand Representative's total compensation in a particular year.  (*See, e.g.*, Pls. Mem., Ex. 10 at 1.)  But even if that is true, the question is whether they received incentive payments to reward their sales efforts, not whether those payments made up a certain proportion of their compensation.  *See Christopher*, 567 U.S. at 165; *cf. Vasto*, 767 Fed. App'x at 57 (rejecting argument that the plaintiffs could not be exempt under the OSE because they were "poorly compensated").

extent that the external indicia set forth in *Christopher* are relevant to that analysis, they further support the conclusion that plaintiffs' primary duty was making sales under § 203(k).

As a last-ditch argument, plaintiffs contend that they "do not meet the spirit of the OSE" because they "did not earn well above the minimum wage." (Pls. Mem. at 22 (internal quotations omitted)). It is true that the OSE "is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that set them apart from the nonexempt workers entitled to overtime pay." *Christopher*, 567 U.S. at 166 (internal quotations and alterations omitted). It is also true that plaintiffs' total compensation was low and less than the detailers in *Christopher* received. (*See, e.g.*, Pls. Mem., Ex. 10 (showing that Zammito earned approximately $16,000 in six months of employment with defendant)). *Compare id.* (noting that detailers "earned an average of more than $70,000 per year"). However, that does not preclude the application of the OSE:

> "Although [p]laintiffs invoke the purported 'spirit and purpose' of the FLSA to suggest that poor compensation negates the reason for an outside salesman exemption, 'it is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law.'" *See* [*Flood*, 904 F.3d] at 234-35 (some alterations in original) (quoting *Encino Motorcars, LLC*, 138 S. Ct. at 1142). "In the absence of words in the statute or regulation that require consideration of the plaintiff's level of compensation when deciding if an employee is 'making sales,' [this Court] decline[s] to add a 'subject to compensation' exception to the 'making sales' requirement of the outside salesmen exemption under the FLSA." *Id.* at 235.

*Vasto*, 767 F. App'x at 57 (original alterations omitted). In other words, because this Court has "no license to give the exemption anything but a fair reading," and no words in the statute or regulations require that an employee be well-paid in order to be "making sales," it will not read in such a requirement here. *See Encino Motorcars*, 138 S. Ct. at 1142.

## 2.   Whether Plaintiffs Were Regularly Engaged Away from Defendant's Place of Business in Performing Their Duties

Because plaintiffs' primary duty was making sales within the meaning of 29 U.S.C. §

203(k), the next question is whether they were "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500. If they were, then the OSE applies and they are exempt. *See id.*

Plaintiffs contend that they did not work customarily and regularly away from defendant's place of business. (Pls. Opp. at 3 n.1). Specifically, they contend that because defendant assigned them "to market products at fixed locations for several weeks at a time," those locations were effectively their employer's place of business. (*Id.*). *See* 29 C.F.R. § 541.502 (explaining that "any fixed site . . . used by a salesperson as a headquarters" can be "considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property").[13]

Plaintiffs raise this argument only in a brief footnote. (*See* Pls. Opp. at 3 n.1). The First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

In any event, even considering the merits, the retail stores where plaintiffs sold products were not defendant's place of business. An employer's place of business includes "any fixed site, whether home or office, used by a salesperson as a headquarters." 20 C.F.R. § 541.502. But it excludes "locations in the field," such as customers' homes or places of business, hotel rooms, or "trade shows of short duration." *Butt v. HF Mgmt. Servs., LLC*, 2020 WL 207393, at *4 (E.D.N.Y. Jan. 14, 2020) (citing *id.*). Thus, courts have held that various locations visited temporarily by employees in order to make sales do not qualify as their employer's place of

---

[13] Notably, the only record evidence that plaintiffs cite in support of their claim that they worked in each location for "several weeks at a time" does not support that contention. (*See* Zammito Dep. at 58:2-5).

business.  *See, e.g.*, *id.* (hospitals, pharmacies, and doctors' offices); *Martinez v. Superior HealthPlan, Inc.*, 371 F. Supp. 3d 370, 382 (W.D. Tex. 2019) (senior centers); *Lane v. Humana Marketpoint, Inc.*, 2011 WL 2181736, at *3 (D. Idaho June 3, 2011) (Walmart stores).  That conclusion holds even if employees visit those locations routinely or sell from a fixed site there, as plaintiffs did here, (*see* Zammito Dep. at 58:2-11, 91:11-23).  *Butt*, 2020 WL 207393, at *4; *Lane*, 2011 WL 2181736, at *3; DOL Opinion Letter FLSA2008-6NA (May 8, 2008).[14]  And it holds even if employees visit those locations pursuant to a contract between their employer and the location's owner, as is the case here, (*see* Pls. Mem., Ex. 1 at 5).  *Butt*, 2020 WL 207393, at *1, *4; *Lane*, 2011 WL 2181736, at *3.  Therefore, the retail stores where plaintiffs made sales do not qualify as defendant's place of business, and the OSE's second requirement is satisfied. *See* 29 C.F.R. § 541.500.

In summary, because the undisputed facts show both that plaintiffs' primary responsibility was making sales and they were regularly away from defendant's regular place of business in performing that duty, the OSE applies, and they are not subject to the overtime requirements of the FLSA.  Moreover, because the parties agree that plaintiffs' parallel state-law claims rise and fall with their FLSA claim, defendant is entitled to summary judgment on those claims, too.  Summary judgment will therefore be granted in favor of defendant.

## IV.  <u>Conclusion</u>

For the foregoing reasons, the motion of plaintiffs Joseph Modeski, Nathan Damboise, Rudy Ortiz, Jeffrey Wolfert, and Giovanni Zammito for summary judgment is DENIED, and the

---

[14] Under some circumstances, a public location may be deemed an employer's place of business if the employees who sell there were "hired to sell [there] and nowhere else" and then stationed there for "months on end." *Freeman v. Kaplan, Inc.*, 132 F. Supp. 3d 1002, 1012 (N.D. Ill. 2015).  Here, however, plaintiffs sold at multiple different store locations and those visits typically lasted less than a week.  (*See, e.g.*, Modeski Dep. at 107:4-9, 250:13-18).

motion of defendant Summit Retail Solutions, Inc., for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Chief Judge, United States District Court

Dated:  July 2, 2020